Dawne C. NURI, Plaintiff,

v.

PRC, INC., Defendant.

No. Civ.A. 97–T–1036–N.

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 3, 1998.

---

Lowell Landis Sexton, Beasley, Wilson, Allen, Crow & Methvin, PC, Montgomery, AL, Thomas D. Simon, Montgomery, AL, for plaintiff.

Thomas A. Radney, Radney, Radney & Brown, P.A., Alexander City, AL, David M. Smith, Carole A. Golinski, Michael E. Turner, Maynard, Cooper & Gale, P.C., Birmingham, AL, for defendant.

## *ORDER*

MYRON H. THOMPSON, District Judge.

This lawsuit, in which a jury found that plaintiff Dawne C. Nuri is entitled to recover $ 10,000.00 in compensatory damages from defendant PRC, Inc. for hostile-work-environment sexual harassment, is now before the court on two motions filed by PRC: its motion for judgment as a matter of law, filed April 16, 1998, and its renewed motion for judgment as a matter of law, filed May 1, 1998. This case is somewhat complicated by the fact that, after the jury returned its verdict, the United States Supreme Court rendered a decision, *Faragher v. City of Boca Raton*, —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), that significantly changed the law within the Eleventh Circuit about when an employer can be held liable for a supervisor's sexual harassment. For the reasons that follow, PRC's motions are denied.

## I. STANDARD FOR JUDGMENT AS A MATTER OF LAW

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides that, "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." In other words, a trial judge must grant judgment as a matter of law "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

In determining whether to grant or deny a Rule 50 motion, all the evidence must be considered in the light, and with all reasonable inferences, most favorable to the party opposed to the motion. *Martinez v. City of Opa-Locka*, 971 F.2d 708, 711 (11th Cir.1992) (per curiam). The motion may be granted only if the evidence points so overwhelmingly in favor of the moving party that no reasonable person could draw a contrary conclusion. "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511; *see also Martinez*, 971 F.2d at 711.

Moreover, the issue is not just what the evidence might show from a cold and unadorned record. The court must also remember that "variations in demeanor and tone of voice" may "bear ... heavily on the listener's understanding of and belief in what is said." *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The court must defer to the jury's findings to this extent as well. *Cf. Id.* What appears in the record to be a statement of fact may have come across as "facetious" to the jury. *See id.* at 579, 105 S.Ct. at 1514 ("We therefore cannot agree that the judge's conclusion that the remark was facetious was clearly erroneous.").

Rule 50(b) further provides, "If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment...."

## II. BACKGROUND

On July 3, 1997, Nuri brought this lawsuit alleging that defendants PRC, Inc., and Litton Industries, Inc., exposed her to hostile-work-environment sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, and that the defendants discharged her in retaliation for engaging in protected activity, also in violation of Title VII. Jurisdiction was properly based on 42 U.S.C.A. § 2000e–5(f)(3) (Title VII) and 28 U.S.C.A. § 1331 (general federal question).

On April 10, 1998, the court entered an order granting in part and denying in part the defendants' motion for summary judgment. The court granted the motion to the extent that it dismissed Nuri's claim of retaliatory discharge, and also granted the motion to the extent that it dismissed Litton as a defendant. The court denied the motion to the extent that it concluded that Nuri had presented sufficient evidence to raise a genuine issue of material fact on her hostile-work-environment sexual harassment claim against PRC. The court found that she had raised an issue with respect to PRC's 'direct liability' for any sexual harassment Nuri may have suffered from her supervisor, but the court also concluded that Nuri had not raised an issue as to PRC's 'indirect liability' for the harassment. Nonetheless, the court did not dismiss or limit her hostile-work-environment sexual harassment claim in its summary-judgment order.

Jury selection and trial began on April 13, 1998. The presentation of evidence took just over three days, and the evidence reflected that, from approximately September 1996 to February 1997, Nuri worked in PRC's Montgomery office, which had approximately five to seven employees at various times. During this time, she worked directly under the supervision of her harasser, Billy Sprayberry. Nuri faced a number of requests by Sprayberry, directed at her personally, for oral sex. Sprayberry admitted to these requests. Nuri was also subjected to an incident in, which Sprayberry called Nuri over to him as though he wanted to whisper something to her, and when she leaned over him, he grabbed her and pushed his head into her breasts. Nuri also faced a situation where Sprayberry wanted her to accompany him on a business trip in January 1997, and when she indicated she could not go, he asked her how he could "fuck her on the beach" if she was not there. These incidents were all in addition to a number of other suggestive comments about her made to her and to other people. Some of the requests and comments directed at Nuri were witnessed by other people.

Closing arguments and jury instructions were given on the fourth day of trial. The court's jury instructions addressed only the issue of PRC's direct liability.[1] Based on the governing law in the Eleventh Circuit, the court's summary-judgment order, and the presentation of evidence at the trial, the issue of PRC's indirect liability appeared to be foreclosed. The jury deliberated for a short time on the fourth day, and returned to deliberate for the entire fifth day. At the end of the fifth day, April 17, 1998, the jury returned the following verdict:

"(1) Was plaintiff Dawne Nuri subjected to sexual harassment?

Yes _√_
No _____

"If no, there is no need to answer the remaining questions. If yes, proceed to question (2).

"(2) Was the harassment complained of unwelcome?

Yes _√_
No _____

"If no, there is no need to answer the remaining questions. If yes, proceed to question (3).

"(3) Was the harassment complained of based upon sex?

Yes _√_
No _____

"If no, there is no need to answer the remaining questions. If yes, proceed to question (4).

---

1. The court notes that neither of the parties objected to the jury instructions' addressing only direct liability and leaving out any instruction on indirect liability.

"(4) Is PRC liable for the harassment complained of by Nuri?

> Yes _✓_
>
> No _____

"If no, there is no need to answer the remaining question. If yes, proceed to question (5).

"(5) If you answered yes to all of the foregoing questions, how much may plaintiff Nuri recover in damages from defendant PRC?

> Compensatory damages $10,000.00
>
> Punitive Damages $ –0–

"SO SAY WE ALL."

Judgment was entered in the case on July 31, 1998.

As stated, the court now has before it two motions for judgment as a matter of law: one was filed just before the case was given to the jury for a decision, and the other was filed after the jury returned with its verdict.

### III. DISCUSSION

The court begins its discussion by analyzing PRC's motions under the law that was governing in the Eleventh Circuit at the time of the trial in this case. The court then turns to a brief discussion of developments in the law since the time of trial.

#### A. Law at the Time of Trial

 A hostile work environment is created "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)); *see also Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989) ("Hostile environment sexual harassment occurs when an employer's conduct 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.'") (quoting *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2405). The Eleventh Circuit has set forth the following five elements to make out the prima-facie case of hostile-work-environment sexual harassment: (1) the plaintiff is a member of a protected group; (2) the plaintiff was the subject of unwelcome conduct; (3) the conduct was based on sex; (4) such conduct affected a term, condition, or privilege of employment; and (5) respondeat superior liability is appropriate. *Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir.1982).

In its motions, PRC does not raise any challenge to the first element (the plaintiff is a member of a protected group) or the third element (the conduct was based on sex) of the prima-facie case. Accordingly, the court assumes that there was sufficient evidence presented at trial as to these elements that would support the jury's verdict. The court, therefore, turns to the evidence presented as to second, fourth, and fifth elements of the prima-facie case.

> 1. Second (Unwelcome Conduct) and Fourth (Term or Condition of Employment) Elements

##### a.

 The second element of the prima-facie case requires evidence sufficient to show that the plaintiff was the subject of unwelcome conduct. The Equal Employment Opportunity Commission's regulations identify the type of conduct that may constitute sexual harassment: "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature...." 29 C.F.R. § 1604.11(a). "In order to constitute harassment, this conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson,* 682 F.2d at 903; *see also,* 29 C.F.R. § 1604–11(a).

In deciding what the court should consider to determine if a plaintiff has been subjected to unwelcome conduct, the Supreme Court has pointed out that the "EEOC Guidelines emphasize that the trier of fact must determine the existence of sexual harassment in light of 'the record as a whole' and 'the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Meritor,* 477 U.S. at 69, 106 S.Ct. at 2406 (quoting 29 C.F.R. § 1604.11(b)). As part of the con-

text in which the alleged incidents occurred, such things as the plaintiff's sexually provocative speech or dress could be relevant. *See id.*

■ However, it cannot be overemphasized that a plaintiff's "use of foul language or sexual innuendo in a consensual setting does not waive her 'legal protections against unwelcome harassment.'" *Burns v. McGregor Elec. Indus., Inc.,* 989 F.2d 959, 963 (8th Cir.1993) (quoting *Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir.1987) (quoting *Katz v. Dole,* 709 F.2d 251, 254 n. 3 (4th Cir.1983))). Furthermore, a plaintiff's use of vulgar language does not necessarily mean that she invited or welcomed what would otherwise be considered sexual harassment. *See Carr v. Allison Gas Turbine Div., Gen'l Motors Corp.,* 32 F.3d 1007, 1010–11 (7th Cir.1994).

■ In this case, the evidence clearly reflected that the employees in PRC's Montgomery office, including Nuri, used foul language, and that the employees circulated dirty jokes to one another in person and via electronic mail. Beyond this general office banter, however, there was no evidence that any employee, including Nuri, solicited or incited a sexually-charged atmosphere. Nonetheless, Nuri had a number of requests for oral sex directed at her by her harasser and supervisor, Billy Sprayberry, she had a number of suggestive comments made to and about her by Sprayberry, and Sprayberry even grabbed her in one incident and pressed his head into her breasts. Nuri was uncomfortable when sexually-charged comments were directed at her, and when she was touched in an offensive way, and she also indicated that such comments and touching were unwelcome. PRC's pointing to Nuri's participation in the general office banter, and her stating that she did not object to it, is not enough to support the conclusion that she was not subject to unwelcome conduct. Using foul language, or sending or receiving dirty jokes, does not waive the protections of Title VII.

### b.

■ The fourth element of the prima-facie case requires that Nuri show that the harassing conduct affected a term, condition, or privilege of employment. This element consists of both an objective and subjective component. First, the objective component requires the plaintiff to show that the alleged harassment is severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370; *see also Fleming v. Boeing Co.,* 120 F.3d 242, 245 (11th Cir.1997); *Watkins v. Bowden,* 105 F.3d 1344, 1351 (11th Cir.1997). Second, the subjective component requires the plaintiff to show that she actually perceived the environment to be abusive. *Harris,* 510 U.S. at 21–22, 114 S.Ct. at 370. Factors that can be considered in determining whether a hostile environment had been created include: "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371.

■ Looking first to the objective portion of the analysis, the court finds that there was sufficient evidence to support a jury finding that there was harassment that was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. The evidence reflected that Nuri worked in a small office—approximately five to seven people at various times—under the direct supervision of her harasser, Sprayberry. Foul language was generally used throughout the office, but Nuri faced a number of requests by Sprayberry, directed at her personally, for oral sex; Sprayberry admitted to these requests while testifying. Nuri was also subjected to one incident in which Sprayberry called her over to him as though he wanted to whisper something to her, and when she leaned over him, he grabbed her and pushed his head into her breasts. Nuri also faced a situation where Sprayberry wanted her to accompany him on a business trip in January 1997, and when she indicated she could not go, he asked her how he could "fuck her on the beach" if she was not there. These incidents were all in addition to a number of other suggestive comments about her made to her and to other people. Some of the requests and comments directed at Nuri were wit-

nessed by other people, both within and from outside the Montgomery office, but the requests continued nonetheless. This evidence could easily support a conclusion that there was harassment pervasive enough that a reasonable person would find the environment hostile or abusive.[2]

Turning to the subjective portion of the analysis, the court finds that the evidence supports the conclusion that Nuri found the environment to be hostile and abusive, and, furthermore, felt that she had nowhere to turn for help. This state of affairs caused her great distress. Her distress was corroborated by PRC's investigative report, and the evidence presented through her testimony and the testimony of others, which indicated that Nuri communicated the situation she was facing to Deborah Holliman, another PRC employee. Nuri's comments about her environment were serious enough that they prompted Holliman to attempt, albeit unsuccessfully, to report what was going on in the Montgomery office to her superiors in the company. This evidence is sufficient to support the conclusion that Nuri actually perceived her environment to be abusive.

<div align="center">c.</div>

There was, therefore, sufficient evidence for the jury to find that the harassing conduct was unwelcome and affected a term, condition, or privilege of Nuri's employment. However, the court is compelled not to stop with this conclusion, but rather to add and emphasize that in a case such as this, where the issue turns not only on *whether* certain words were said but how they were said, a cold and unadorned record may not adequately capture what the jury actually heard. Words, in particular, in sexual and racial harassment cases, can take on very different meanings depending on how they were said and the context in which they were said. For example, a sexually vulgar term, depending on the tone of the speaker, may come across as humourous or facetious or as a sexual advance or a request for a sexual favor. *See Anderson v. Bessemer City*, 470 U.S. at 579, 105 S.Ct. at 1514 ("We therefore cannot agree that the judge's conclusion that the remark was facetious was clearly erroneous."). Here, the jury apparently found that Nuri's supervisor crossed the line of decency, and the court is concerned that the record may not adequately reflect this distinction.

Therefore, the court feels obligated to observe that not only can it safely conclude that the jury could have reasonably found, based on the evidence presented, that Nuri was the subject of unwelcome conduct that affected a term, condition, or privilege of her employment, the court itself, having personally eyed each witness as he or she testified and having personally been able to hear both *what* the witness said and *how* he or she said it, agrees with the jury's verdict. Although the evidence showed that many of the employees, including Nuri, used profanity and circulated dirty jokes, there was a point at which it became clear that Sprayberry's comments about "blowjobs" and other lewd suggestions were not part of the office banter—they were demands directed at Nuri that could not be ignored or laughed off. This distinction in the evidence was brought into sharper focus when the appropriate weight was given to

---

2. PRC has repeatedly raised the issue that during the time of her alleged harassment, Nuri had a number of business-related contacts with Sprayberry's superiors, who were located in other offices in Texas and Virginia. PRC argues that these contacts would presumably have provided her with the opportunity to report Sprayberry's conduct to someone who would have been able to do something about it, and thus that a substantial portion of the harassment she faced was brought on by her failure to act. Nuri's failure to make complaints is clearly relevant in the context of whether PRC should be held liable for Sprayberry's harassment, but the court does not believe it is relevant here. For this element of the prima-facie case, the court simply takes the harassment that has been shown by the evidence and determines if it rises to the level of affecting a term, condition, or privilege of Nuri's employment. That some of the harassment could have been prevented is an inquiry that is built into the analysis of the fifth element of the prima-facie case, and does not come up here.

In any event, even if Nuri's inaction were relevant here, she claims that she was not aware of PRC's sexual harassment policy, and thus that she did not know what constituted sexual harassment, nor that it should be reported. She attributes her lack of knowledge to PRC's failure to inform its Montgomery employees about the policy, which appears to be supported by the evidence, and which would take all of the force away from PRC's argument that she could have somehow mitigated the harassment by reporting under the terms of its policy.

the credibility of the witnesses, as well as their tone of voice and demeanor.

2. Fifth (Liability) Element

The fifth element of the prima-facie case requires evidence sufficient to show that respondeat superior liability is appropriate. This area of law in the Eleventh Circuit has changed substantially in the past month because of the Supreme Court's decision in *Faragher v. City of Boca Raton,* — U.S. —, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("*Faragher II*"), which reversed the judgment of the Eleventh Circuit in *Faragher v. City of Boca Raton,* 111 F.3d 1530 (11th Cir.1997) (en banc) ("*Faragher I*"). In this section, the court will discuss only the law governing hostile-work-environment sexual harassment claims up through the time of trial and the time of the jury's deliberations. This law includes *Faragher I* and related Eleventh Circuit precedent. The discussion will not reach *Faragher II,* which was decided after the jury rendered its verdict in this case, nor its impact on the law of the Eleventh Circuit or on outcome of this case.[3] All of these issues will be discussed in § III.B *infra.*

a. Indirect Liability

An employer can be held liable for hostile-work-environment sexual harassment perpetrated by its employees either directly or indirectly. *Faragher I,* 111 F.3d at 1535. "[A]n employer is indirectly, or vicariously, liable for the wrongful conduct of its agent," regardless as to "whether or not the employer knew or should have known about the agent's wrongful act." *Id.* In *Faragher I,* the Eleventh Circuit reaffirmed that a supervisor's actions are imputed to the employer only where the supervisor either (1) is acting within the scope of his employment, or (2) was aided in his harassment by authority given him by the employer. *Id.* at 1536.[4]

As a general matter, harassing activity is not within the scope of a supervisor's employment because the supervisor generally is attempting to achieve some personal end as opposed to some purpose authorized by the employer. *Faragher I,* 111 F.3d at 1536 ("[A]n agent is not acting within the scope of his employment when he is 'going on a frolic of his own'.... In this scenario, the agent steps outside of his employment ... to further some personal end...."). A supervisor generally is not aided by the authority given him by the employer unless, for example, the supervisor held it over the plaintiff's head that the supervisor had authority to fire the plaintiff if the plaintiff did not do as the supervisor wished. *Id.* at 1537 ("In one sense, a supervisor is always aided in accomplishing hostile environment ... by the existence of an agency relationship with his employer. However, the common law rule does not use 'aided' is such a broad sense."); [5] *see also Torres v. Pisano,* 116 F.3d 625, 635 (2d Cir.) (stating that agency relationship gives supervisor responsibilities that provide proximity and increase contact with employee, and may even cause employee to fear repercussions that might result from complaining or resisting, but these alone, without evidence that supervisor used authority to place employee in a position in which employee could not complain without facing adverse consequences, are insufficient to amount to being 'aided' by agency relationship), *cert. denied,* — U.S. —, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

In light of the restrictive standard in force in the Eleventh Circuit at the time, the court concluded in its summary-judgment order that Nuri had not proffered sufficient evi-

3. The court notes that the fifth element of the prima-facie case—liability for PRC—presents the most vigorously contested set of issues is this case, both with respect to whether the evidence presented was sufficient and with respect to the impact of the recent changes in the law. This is in sharp contrast to the first four elements of the prima-facie case where the law is, and remains, well-settled and where the evidence presented as to these elements was clearly sufficient. The court notes this contrast to point out that, should a re-trial be necessary in this case, the issue to be re-tried would be very narrow. With the jury's special verdict as to the first four elements of the prima-facie case, in areas of the law that are well-settled, the court would not need to revisit these elements in order to address satisfactorily any problem areas raised concerning PRC's liability.

4. As will be explained in more detail in § III.B, it was the Eleventh Circuit's approach to determining indirect liability for supervisors in *Faragher I* that was specifically reversed by the Supreme Court. That is, this particular description of the law is no longer binding precedent.

5. *See supra* note 4.

dence on this basis of liability to raise a genuine issue of material fact. Although the court reached this conclusion, it did not dismiss or limit any portion of Nuri's hostile-work-environment sexual harassment claim at the summary-judgment stage. Based on the court's conclusion in its summary-judgment order, the continued viability of the Eleventh Circuit's standard, and an apparent dearth of evidence that could meet the Eleventh Circuit's standard, the issue of PRC's indirect liability did not figure prominently at the trial. That is, Nuri did not present sufficient evidence that could support a jury verdict on the basis of indirect liability. Specifically, she presented little or no evidence that Sprayberry was acting within the scope of his employment, nor that Sprayberry had been aided in his harassment, in the sense used by the Eleventh Circuit, by the authority given him by PRC.

**6.** The Supreme Court did not review the Eleventh Circuit's ruling in *Faragher I* with respect to establishing direct liability. The Court expressly declined to do so because it reversed the Eleventh Circuit's ruling with respect to indirect liability. *See Faragher II*, —— U.S. at ——, 118 S.Ct. at 2294.

**7.** *See supra* note 6.

**8.** To determine whether a employer knew of the harassment, one must look at whether there is evidence the employee presented her complaints to higher management. Higher management is not well-defined by the Eleventh Circuit, but the Seventh Circuit Court of Appeals has adopted a helpful approach used by it and the Second Circuit for addressing this issue. *See Young v. Bayer Corp.*, 123 F.3d 672, 674–75 (7th Cir.1997); *Torres v. Pisano*, 116 F.3d 625, 636–638 (2d Cir. 1997). This approach identifies the appropriate people to whom an employee should complain as (1) someone who has the authority to terminate the harassment of which the employee is complaining, or (2) someone who is obligated to, or could be reasonably expected to, refer the complaint to someone described in (1). *Young*, 123 F.3d at 675.

The court, with the agreement of both Nuri and PRC, used this approach in its jury instructions, with one additional limit to accommodate ¶ 4.2 of PRC's sexual harassment policy, which defines the responsibilities of PRC employees: "Employees are responsible for conducting themselves in ways that ensure that others are able to work in an atmosphere free from sexual harassment and for reporting any incidents in which they have knowledge of the behavior that could be construed as sexual harassment and for cooperating in any associated investi-

### b. Direct Liability

■ "An employer is directly liable for hostile environment sexual harassment if it knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action." *Faragher I*, 111 F.3d at 1535 (citing *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989); *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir.1982)).[6] A plaintiff can prove an employer's knowledge of harassment by showing she complained to higher management or by showing that the harassment was pervasive enough to charge the employer with constructive knowledge. *Id.*[7] Because the court concludes that the evidence supports the conclusion that PRC should have known of the harassment suffered by Nuri, it is unnecessary to reach whether the evidence supports the conclusion that PRC knew.[8]

gation. Any violation of this policy observed by employees should be addressed immediately. The offending individual should be advised that the conduct in question is offensive and that it be discontinued immediately. If the harassment persists, the employee should pursue the matter with management, Human Resources or the EEO department."

Under the Seventh Circuit's standard, in conjunction with PRC's sexual harassment policy, any employee's knowledge of sexual harassment could arguably be viewed as constituting a complaint to higher management, because every employee, after taking the steps described in ¶ 4.2, would be obliged to report anything he or she knows about sexual harassment to management or the human resources department. This result casts the Seventh Circuit's net too broadly, attributing knowledge to PRC where it could not be reasonably expected to exist. The Seventh Circuit's standard contemplates knowledge being attributed to the employer when someone in the company with authority over harassment matters, or someone who reports to such a person by virtue of his management responsibility, learns about the harassment. The standard does not extend to co-workers, or other persons who could not be reasonably expected to report such information by virtue of their position and relationship to the complainant. *See Young*, 123 F.3d at 674–75. To clarify this point, the court's jury instructions on the knew-standard were as follows:

"Did PRC know of the sexual harassment against Nuri?
(1) To determine if PRC knew, you must ask yourself whether Nuri complained to higher management in the corporation. To qualify as complaining to higher management, she must have complained to (i) someone who had the

As a first step in determining whether PRC should have known about Sprayberry's conduct, the court notes that "an employer is insulated from liability under Title VII for a hostile environment sexual harassment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress." *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997).[9]

PRC asserts that it is insulated from liability because it had an anti-discrimination policy that meets the requirements of *Farley*. The court agrees with PRC insofar as the evidence supports that PRC had a comprehensive policy that was vigorously enforced, and that provided alternative avenues of redress. On the issue of whether the policy was well-known to PRC's employees, the evidence supports Nuri's contention that, at least as far as the employees of the Montgomery office go, the policy was not so well-known. PRC established that it sent Nuri a new employee package when she began work, but PRC had no evidence about whether the package contained an adequate description of PRC's sexual harassment policy. PRC also established that it sent out two mailings—one in 1993 and another in 1995—detailing PRC's sexual harassment policy, but the evidence reflected that three employees who worked in the Montgomery office never received any such mailings. PRC also published an article about sexual harassment in its June 1995 newsletter, but the article did not detail the procedures one would use to report sexual harassment at PRC, and there was also no confirmation that any of the employees in the Montgomery office saw the article. Finally, PRC presented evidence

---

authority to address or terminate the harassment of which she was complaining, or (ii) someone who, in light of his or her management position, was obligated to, or could be reasonably expected to be obligated to, receive and refer the complaint to someone described in (i). The fact that a person has mere knowledge of sexual harassment does not mean that this person is obligated to, or could be reasonably expected to be obligated to, receive and refer a complaint of sexual harassment. If you think that PRC did not know, this is the end of the inquiry with respect to question one, and you must proceed to question two.
(2) If you think that PRC did know about the harassment faced by Nuri, you must then ask yourself if PRC took immediate and appropriate corrective action. To determine if PRC took immediate and appropriate corrective action, you must ask yourself if it took action that was reasonably likely to prevent the misconduct from recurring. What is appropriate remedial action will necessarily depend on that particular facts of case. If you believe that PRC knew, and that it did not take appropriate corrective action, you may hold PRC liable for the sexual harassment faced by Nuri, and you need not answer question two. If you believe that PRC took appropriate corrective action, you must proceed to question two."
*See infra* note 9 (setting forth question two).

9. In its charge to the jury, the court explained the should-have-known standard as follows:

"Should PRC have known of the sexual harassment faced by Nuri? This inquiry assumes that PRC did not know, or that it was possible that it should have known before it actually did.

(1) Before addressing this question, you must first ask yourself if PRC had an anti-discrimination policy that met all of the following requirements: (i) it was comprehensive, (ii) well-known to employees, (iii) vigorously enforced, and (iv) provided alternate avenues of redress. If PRC had such a policy, and Nuri failed to use it, you cannot hold PRC liable on the theory that it should have known about the harassment she faced, and this is the end of this inquiry. If you do not think PRC had such a policy, you must move on to the next inquiry.
(2) If PRC did not have such a policy, you must next ask yourself if the sexual harassment Nuri faced was pervasive enough so that PRC's higher management, as described above under question one, should have known that it was taking place, even though it did not know. Some of the things you may consider in making this determination are the remoteness of the location of the harassment as compared to the location of management; whether the harassment occurred intermittently over a long period of time; whether the victim was employed on a part-time or full-time basis; and whether there were only a few, discrete instances of harassment. To answer this question, you are required to make a separate inquiry into the evidence from the one you made to determine if the harassment was pervasive enough to affect a term or condition of Nuri's appointment, described above. If PRC did not have such a policy, but the harassment was not so pervasive that it should have known about it, then you cannot hold PRC liable. If PRC did not have such a policy, and the harassment was so pervasive that it should have known about it, then you may hold PRC liable for the harassment that Nuri faced."

that it conducted a live new employee orientation for employees beginning work in its Virginia office, and that the company did sexual harassment training for some of its offices, but these also appear to have missed Montgomery. The short of the evidence is that, although PRC did engage in a number of different efforts to distribute its sexual harassment policy, the evidence indicates that these efforts failed in the Montgomery office.[10] Consequently, there is sufficient evidence that could support the jury's verdict that PRC should not be insulated from direct liability under *Farley*.

The court must now turn to the question of whether Nuri has presented sufficient evidence that the harassment she faced was pervasive enough to charge the employer with constructive knowledge. To assist in making this second inquiry, courts have considered the following factors: "the remoteness of the location of the harassment as compared to the location of management; whether the harassment occurs intermittently over a long period of time; whether the victims were employed on a part-time or full-time basis; and whether there were only a few, discrete instances of harassment." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir.1997).

In light of the harassment Nuri faced—a number of requests, directed at her personally, for oral sex, Sprayberry's grabbing her and pushing his head into her breasts, Sprayberry's questioning how he could "fuck her on the beach" if Nuri could not go on a business trip with him, and a number of other suggestive comments about her made to her and to other people—the evidence supports the conclusion that the harassment Nuri faced was regularly occurring. This evidence alone may not be enough to support

the conclusion that, upon reasonably diligent inquiry, PRC should have known about the harassment faced by Nuri, but when it is coupled with the facts that Sprayberry began harassing Nuri shortly after his arrival in September 1996, and his harassment was witnessed by people within the Montgomery office and from outside the Montgomery office, including Deborah Holliman, a PRC employee working in the Virginia office, it seems that, if PRC had made a reasonably diligent inquiry before the visit of Sprayberry's immediate supervisor, Robert Harrison, in mid-January 1997 to investigate the sexual harassment allegations, it could have discovered what was going on. There was no shortage of incidents to observe directly, and no shortage of people who were aware of what Nuri faced. At the minimum, PRC could have discovered the harassment a couple months before it was brought to its attention, and there was sufficient evidence to support such a conclusion by the jury. Nuri has, therefore, presented sufficient evidence for the jury to find direct liability for PRC on this basis.

### B. Change in Law after Trial

The state of the law with respect to an employer's liability for the hostile-work-environment sexual harassment of its supervisors changed dramatically in the Eleventh Circuit following the Supreme Court's decision in *Faragher II*, which reversed the Eleventh Circuit's decision in *Faragher I*.

In *Faragher I*, the Eleventh Circuit set out a very narrow set of circumstances in which an employer could be held indirectly liable for the harassing conduct of one of its supervisors. Liability could be imputed to an employer for the supervisor's actions only

---

**10.** As this court explains later, the standard set forth in *Farley* is very similar to the affirmative defense articulated in *Faragher II*. In *Faragher II*, the Supreme Court wrote:

"The District Court found that the City had entirely failed to disseminate its policy against sexual harassment among the beach employees and that its officials made no attempt to keep track of the conduct of [the harassing] supervisors.... Under such circumstances, we hold as *a matter of law* that the City could not be found to have exercised reasonable care to prevent the supervisors' harassing conduct. Unlike the employer of a small workforce, who

might expect that sufficient care to prevent tortious behavior could be exercised informally, those responsible for city operations could not reasonably have thought that precautions against hostile environments in any one of many departments in *far-flung locations* could be effective without communicating some formal policy against harassment, with a sensible complaint procedure."

—— U.S. at ——, 118 S.Ct. at 2293 (emphasis added) (citations omitted). The comments from *Faragher II* could be said to apply with equal force here.

where the supervisor either (1) is acting within the scope of his employment, or (2) was aided in his harassment by authority given him by the employer. 111 F.3d at 1536. The Eleventh Circuit further established that the presumptions generally favored the conclusions that a supervisor was not acting within the scope of his authority when he harassed an employee—rather, he was considered to be acting for personal gain when engaged in any harassment—and that the supervisor was generally not aided by the authority given him by the employer simply by virtue of being a supervisor.

In *Faragher II*, the Supreme Court agreed generally with the Eleventh Circuit's analysis of whether a supervisor was acting within the scope of his employment when he engaged in harassment, but held "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages...." —— U.S. at ——, 118 S.Ct. at 2292–93. In reaching this holding, the Supreme Court established liability, subject to the affirmative defense, in all situations where "the servant purported to act or speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." *Id.* at ——, 118 S.Ct. at 2290 (quoting Restatement (Second) of Agency § 219(2)(d) (1957)). This holding changed the presumption to exactly the opposite of what had previously been established by the Eleventh Circuit.

The Supreme Court then went on to describe the affirmative defense:

"The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense."

*Id.* at ——, 118 S.Ct. at 2293.

Considering the new presumption, and the affirmative defense, the impact of the two on the outcome of this case clearly would be to favor Nuri. Whereas at the time of the trial in this case, the law of the Eleventh Circuit was so strict as to make it very difficult for Nuri to show that PRC could be indirectly liable for Sprayberry's conduct, the current law is exactly the opposite. Nuri would have had a presumption in her favor that PRC would be indirectly liable for Sprayberry's conduct subject to PRC being able to prove the affirmative defense set forth by the Supreme Court. The affirmative defense requires PRC to show (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Because *Faragher II* was handed down just one month ago, the details of the affirmative defense have not been fully established, but from the Supreme Court's description of how one can satisfy the affirmative defense, it sounds very much like the standard set forth in *Farley* for determining if an employer is insulated from liability on the "should have known" prong of direct liability. *See supra* § III.A.2.b. That is, an employer is only insulated from direct liability as to whether it should have known of the harassment one of its employees has adopted "an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress." *Far-*

*ley*, 115 F.3d at 1554. As the court has already discussed above, PRC appears to have had a comprehensive, vigorously enforced policy that provides alternate avenues of redress. But Nuri presented substantial evidence that it was not well-known, and in fact, not known at all, to PRC's employees in the Montgomery office. Because having its employees be aware of the policy is so crucial to having a policy that is effective, and based on the evidence presented at trial, it is seriously doubtful that PRC could be said to have "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." [11] Furthermore, if Nuri was not aware of PRC's policy, it would be difficult for PRC to establish that she "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." At the very minimum, the burden would have been switched from Nuri to PRC, giving her another viable means of establishing PRC's liability that was not previously available. And, based on the evidence presented it appears that there would at least be a serious question about whether PRC could prove its affirmative defense. Had the current law been in effect at the time of trial, all indications are that it would have further supported Nuri.[12]

## IV. CONCLUSION

For the foregoing reasons, it is ORDERED that defendant PRC Inc.'s motion for judgment as a matter of law, filed April 16, 1998, and PRC's renewed motion for judgment as a matter of law, filed May 1, 1998, are denied.

---

**11.** *See supra* note 10.

**12.** *See supra* note 3.