**Sarah BRANDRUP, Plaintiff,**

v.

**Thomas STARKEY and Lattice Semiconductor Corporation, a Delaware Corporation, Defendants.**

**No. CIV. 97–1208–KI.**

United States District Court,
D. Oregon.

Sept. 8, 1998.

John E. Uffelman, Adams, Debast, Helzer, McFarland, Richardson & Uffelman, LLP, Beaverton, OR, for Plaintiff.

John V. Acosta, Therasa A. Healy, Stoel Rives LLP, Portland, OR, for Defendants.

## OPINION

KING, District Judge.

Plaintiff Sarah Brandrup sues defendants Walter Thomas Starkey and Lattice Semiconductor Corporation ("Lattice") for sexual discrimination, under federal and Oregon law, as well as for wrongful discharge and intentional infliction of emotional distress under Oregon law. Defendants have filed a motion for summary judgment (# 17) against all of plaintiff's claims. For the reasons set forth below, I grant in part and deny in part defendants' motion.

Also before the court are plaintiff's motions to reopen discovery (# 39–1), to compel discovery (# 39–2), and for sanctions (# 39–3). For the reasons set forth below, each of those motions is denied.

## FACTS

### I. *Relevant Events*

Brandrup began her employment with Lattice in October 1992 as a production operator in manufacturing. During her employment, she worked several different shifts for several different supervisors. In November 1994, she switched from the "swing shift" to the "weekend shift," which required her to work 12–hour days on Friday, Saturday, and Monday. When she began working the weekend shift, her supervisor was Hal Wilson. Wilson did not work on Mondays, however, so for one day a week Brandrup reported to Starkey. In March 1995, Brandrup switched to the day shift under the supervision of Starkey. Brandrup remained on the day shift under Starkey's supervision until her last day on the job, July 11, 1995. Thus, Brandrup was supervised by Starkey for approximately eight months.

On July 10, 1995, Brandrup placed a letter of resignation on Starkey's desk while Starkey was talking to another employee. The letter read: "As of 7/10/95 I'm giving my 2

week notice[.][M]y last day will be 7/21/95." At no time did Brandrup indicate to Starkey that he should keep her resignation confidential.

After giving Starkey her resignation, Brandrup alleges that her co-workers began acting in a rude and immature manner toward her that same day, presumably because of her resignation. Brandrup believed that Starkey had told the other employees that Brandrup had resigned and that it was inappropriate for Starkey to have done so. Nevertheless, Starkey's alleged actions in telling other employees about Brandrup's resignation was not a factor in Brandrup's decision to resign, which had already been made before she gave her letter of resignation to Starkey.

The behavior of her co-workers prompted Brandrup, along with her friend and co-worker, Jenny Clark, to request a meeting that day with Lattice's Human Resources Administrator, Linda Rowles. After informing Rowles that she was resigning, Brandrup complained about the treatment by her co-workers and the fact that Starkey had allegedly told others about Brandrup's resignation. Brandrup testified that she also informed Rowles at this meeting that Starkey had been sexually harassing her. Brandrup claims that she used the words "sexual harassment" but did not give any specific examples of such harassment. Clark testified that she and Brandrup did not use the words "sexual harassment" in relation to Starkey but that they did discuss with Rowles things that Starkey had said to them. In an affidavit submitted to the Equal Employment Opportunity Commission ("EEOC"), Rowles denied that any allegations or examples of sexual harassment regarding Starkey were discussed at the meeting but stated that Brandrup commented "I've had to put up with so much from him." Rowles EEOC Aff. (5/22/96), Exh. A. At the conclusion of the meeting, Rowles "suggested that Ms. Brandrup go to Mr. Starkey and tell him that she was upset and disappointed by his actions since she had given him notice of her resignation that morning." Rowles EEOC Aff. (5/22/96), ¶ 4.

The July 10, 1995 meeting with Rowles was the first time Brandrup had informed Lattice's Human Resources department, or anyone else in management, about Starkey's alleged harassing conduct. Both Brandrup and Clark admit, however, that they knew that they could have gone to Lattice's Human Resources department to report such a problem with their supervisor. Likewise, Brandrup was aware in early 1995 that another Lattice employee, Colleen Stahlhut, had filed a complaint with Lattice's Human Resources department regarding sexual harassment or wrongful discharge by a supervisor. Although Brandrup was aware that she could have complained to Lattice's Human Resources department about Starkey, she did not feel comfortable doing so.

At the time of the alleged harassing conduct at issue in this action, Lattice had in effect a two-page policy entitled "Employee Harassment" that became effective March 29, 1992. One of the definitions of sexual harassment contained in the policy includes "unwelcome physical and/or verbal conduct of a sexual nature directed toward one employee by another employee" that "has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Under the heading "Procedure," the policy states:

> Any employee or applicant who believe[s] he or she has been harassed as defined above is strongly encouraged to communicate this concern either verbally or in writing to Human Resources and/or their immediate supervisor, department manager, or director. In order to maintain an environment free from harassment, employees and employment applicants must communicate their concerns to management in a timely fashion. The employee can rest assured that this concern will be held in strictest confidence, and thoroughly investigated and resolved to the extent possible. Retaliation by a supervisor or fellow employee in response to the filing of a harassment complaint shall not be tolerated and may subject the retaliator(s) to severe disciplinary action.

Terry Dols, the Director of the Lattice's Human Resources department, testified that there was no training of employees such as Brandrup or Clark concerning the sexual

harassment policy. Although he testified that, under the "new" employee orientation process, all new employees are given a copy of the policy in a "standards of business conduct packet," and are then asked to review, read, and acknowledge that they have read and understand the policy, he could not recall whether that procedure was in place at the time Brandrup was employed.[1] Rowles confirmed that, under Lattice's more recent hiring practices, an employee is given the sexual harassment policy upon commencing employment and asked to acknowledge it in writing. She also testified that, beginning in November 1996, each Lattice employee was asked to acknowledge the harassment policy once a year during the employee's "vocal review." Prior to Lattice's practice of giving employees a copy of the policy upon hiring and at an annual review, Rowles confirmed that an employee would have had to make a request to a supervisor to see the policy. Other than through this method, the record contains no evidence of a means by which Brandrup could have been made aware of the sexual harassment policy or its terms. Likewise, the record does not reflect that she had actual knowledge of the policy or its terms.

In accordance with Rowles' suggestion at the completion of their July 10, 1995 meeting, Brandrup and Clark asked to speak with Starkey on the morning of July 11, 1995. Starkey asked his supervisor, Steve Ward, to attend the meeting. Brandrup and Clark explained how their co-workers were making them feel uncomfortable following Brandrup giving her two-week resignation notice the day before. Brandrup testified that Starkey and Ward told her that there was nothing they could or would do to remedy the situation with her co-workers. Other than the treatment of Brandrup and Clark by their co-workers, no other topics were discussed at the meeting.

At the conclusion of the meeting, Brandrup and Clark "handed in [their] badges," cleaned out their lockers, and . resigned. Some time before leaving the building, Brandrup and Clark communicated their decision to resign to Rowles. Rowles or Dols

then told them to make a list of all the allegedly harassing behavior that Starkey had exhibited toward them.

That same afternoon, July 11, 1995, Brandrup and Clark returned to Lattice and met with Dols. Brandrup and Clark presented a list that contained 17 allegedly inappropriate comments or actions by Starkey. During the meeting, Dols, Brandrup, and Clark discussed "everything that Tom had done" for "quite some time." Brandrup Dep. at 62. In an affidavit filed with the EEOC, Dols described the meeting as follows:

> Ms. Brandrup and Ms. Clark returned to me with a list approximately two hours later. I reviewed and discussed each item on the list with Ms. Brandrup and Ms. Clark. Throughout this conversation, both Ms. Brandrup and Ms. Clark were vague and unable to provide me with specific details. I asked for dates, names of witnesses and other details which would assist me in reviewing their complaints. I wrote very brief notes on their list. [reference to exhibit omitted]. I again asked why they had not confronted Mr. Starkey, or talked to his manager or brought their issues to the Human Resources Department earlier. Ms. Brandrup told me that she was afraid of Mr. Starkey and did not want to put her job at risk. She said that it would not do any good to approach Mr. Starkey's manager, Steve Ward, because he and Mr. Starkey were friends. She also indicated that Mr. Starkey had discouraged her as well as others from discussing problems with the Human Resources Department. She repeated her fear about the possibility of Mr. Starkey being angry and putting her job in jeopardy if she had brought the issue to the Human Resources Department. She said that she believed that Mr. Starkey would retaliate if she had brought the issue to the attention of Lattice management. I told Ms. Brandrup and Ms. Clark that I would look into this matter immediately.

Dols EEOC Aff. (5/22/96), ¶ 7. At the end of the meeting, Dols told Brandrup that "they

---

1. Dols also testified that if Brandrup had signed off on Lattice's sexual harassment policy, there would be a record of it in her personnel file. Although evidence was submitted that Brandrup signed off on other corporate policies in January 1995, there is no evidence that she signed off on the company's sexual harassment policy.

were going to be confronting Tom, investigating it and would let [her] know what was going on with it." Brandrup Dep. at 62. Brandrup informed Dols at that time that she would not be returning to work. Although Brandrup did not, in fact, return to work, she was paid through July 21, 1995.

On July 12, 1995, Dols began an investigation into the allegations made by Brandrup and Clark against Starkey. According to his affidavit filed with the EEOC, Dols met with Starkey, Ward, and a number of then current and former female employees who reported to Starkey. In a report dated July 31, 1995, Dols made the following "summary and recommendation" based on his investigation:

> I was unable to substantiate Sarah and Jenny's assertions that Tom made comments to them or others that were sexual in nature. Therefore, I don't believe Tom engaged in sexual harassing behavior but clearly demonstrated that he needs help with his interpersonal skills and becoming more sensitive to how he's coming across to his people.
>
> Tom failed to exercise appropriate supervisory judgment in his interactions with Sarah. She as well as Jenny Clark were perceived to have been "favorites" thus allowing them preferential treatment. He did not manage their unprofessional behavior as aggressively as he did others in the group. Tom also exhibited poor judgment in his tendency to "joke around" which frequently involved sarcastic and/or caustic comments. His sense of humor was easily misunderstood and may have contributed toward the creation of a hostile work environment.
>
> I recommend that Tom re-read LSC's policy on Employee Harassment and that within 30 days be scheduled for a class on Supervision and Interpersonal Skills.

Dols EEOC Aff. (5/22/96), Exh. A.

## II. *Alleged Harassing Conduct*

As noted above, Brandrup and Clark provided Dols with a list of 17 alleged inappropriate acts or comments by Starkey. Those alleged incidents were reiterated in Brandrup's Oregon Bureau of Labor and Industries ("BOLI") complaint. Unless otherwise indicated, the comments or acts were allegedly directed toward Brandrup:

1. A comment that "I'll rape you if you don't move over."

2. A request that she bend over to pick up his keys that he had dropped on the floor. Brandrup testified that she interpreted these actions as Starkey's attempt to be able to look down her blouse. She testified that he did not say anything that indicated such an intent but that she inferred such intent "because of the smirk on his face ."

3. A comment about Brandrup being a "fat pig" when she was pregnant. When she was not pregnant, he referred to her as "babe."

4. A comment about her breast size.

5. A request that she run away to Florida with him.

6. A question to Clark inquiring if she and Brandrup wanted to go to a nude beach called "High Rocks" near his house. Clark communicated this request to Brandrup.

7. A photocopy of a newspaper article (containing no pictures) that he gave to Brandrup and Clark about clitoridectomies in African tribes.

8. A question to Clark inquiring if she rode bulls.

9. Comments about having sex in Vietnam. Specifically, as phrased in Brandrup's BOLI complaint, "He told Sarah a story about when he was in Viet Nam, he and his buddies would have sex with Vietnamese women who would insert a hanky with knots into his anus, and just as he was about to orgasm they would yank it out knot by knot by knot." In an affidavit submitted to the EEOC, Starkey stated "On one occasion, Ms. Brandrup asked if I had ever used scarves in lovemaking. I responded by saying that I had when I was in Vietnam or Asia. The issue was dropped when another employee called me over to where they were working. Neither Ms. Brandrup or I reinitiated any further discussion about this topic." Starkey EEOC Aff. (5/15/96), ¶ 13.

10. A comment that his wife would not have sex with him.

11. A reference to his wife as a "fat bitch."

12. A question on a Monday morning if she "got lucky" over the weekend and, if so, to tell him all about it.

13. A comment to Clark that his size hurt women.

14. A comment that he was not going to tell her when men called and left messages because he was jealous. Brandrup testified that she viewed the comment as a joke and that it did not offend her.

15. A gesture of sticking out his tongue with gum on it when Brandrup requested a piece of gum. In her BOLI complaint, Brandrup specifically alleged that she "asked if she may have a piece of gum, please. He responded by hanging the piece he was chewing out on his tongue and saying she would have to get it from his mouth with her mouth. She walked away."

16. A comment that he could see her through a window at work and that he daydreamed about watching her through a bedroom window.

17. The comment "Don't wear red. It totally turns me on and I will be in the bathroom all day."

Brandrup also alleged in her judicial complaint that "Defendant Starkey used crude gestures to suggest touching Plaintiff on her seat." Complaint, ¶ 2.6. Brandrup made a similar allegation in her BOLI complaint: "After lunch as she was sliding down the booth to get out from behind the table, Tom was seated on the booth at the table adjacent. As she slid his direction, Tom put his hands in her direction and made 'pinchy feeley' motions with his fingers in the direction of her fanny, as if he was going to grab her seat. Everyone saw it. She said, 'Oh, God, Tom' and brushed it off." [2]

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the nonmoving party. Accordingly, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31.

## DISCUSSION

### I. Sexual Harassment Claims

Brandrup alleges sexual discrimination in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Oregon counterpart, ORS 659.030. Specifically, she alleges that the acts of Starkey, as her supervisor, created a hostile environment within which she suffered sexual harassment.

### A. Severity and Pervasiveness of the Alleged Conduct

In *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court clarified the legal standards that apply to claims under Title VII for sexual harassment. The Court reiterated the general premise that sexual harassment that is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment" violates Title VII. *Id.* at 2283 (quoting *Meritor*

**2.** For purposes of this opinion, this alleged incident will be referred to as Brandrup's allegation number 18.

*Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986)); *see also Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995) (to establish the existence of a sexually hostile environment, a plaintiff must show that: "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, (3) the conduct was 'sufficiently severe or pervasive [so as] to alter the conditions of … employment and create an abusive working environment.' "). The Court also went on to outline the more specific considerations that are relevant in assessing the viability of a hostile environment claim:

> [I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Most recently, we explained that Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." A recurring point in these opinions is that "simple teasing," offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."

*Faragher,* —— U.S. at ——, 118 S.Ct. at 2283 (internal citations omitted).

Defendants argue that, even if the alleged instances of harassment occurred, they were not severe or pervasive as a matter or law and, therefore, Brandrup's federal and state claims for sexual harassment must fail.[3] As part of this argument, Defendants assert that the list of conduct alleged by Brandrup must be pared down to reflect what comments or

actions are even theoretically actionable. *See* Defendants' Reply, pp. 4–5. First, defendants point out that items 6, 8, and 13 were comments made to Clark, not Brandrup. Defendants next note that in regard to item 14, Brandrup testified that Starkey's comment did not offend her. As to items 5, 10, and 11, defendants argue that, while these comments are offensive, they do not have the requisite offensive sexual connotations. Finally, as to items 2, 7, and 15, defendants categorize these acts as "nonverbal behaviors that, viewed in a light most favorable to plaintiff, are not actionable as they are in no way sexually charged or based on plaintiff's sex and, in any event, are not 'severe' as that term has been applied by the courts." Defendants' Reply, p. 5.

For the sake of argument, I eliminate, with two exceptions, these items and accept that the relevant conduct for purposes of this motion are the incidents that defendants have not classified as irrelevant. The two exceptions that I take relate to item 2, in which Brandrup alleges that Starkey dropped his keys and requested that she pick them up, and item 5, in which Brandrup alleges that Starkey asked that she run away with him to Florida.

The remaining incidents, which defendants characterize as "rude" but not severe or pervasive enough to sustain a claim for sexual harassment, are (as numbered above):

1. A comment that "I'll rape you if you don't move over."

3. A comment about Brandrup being a "fat pig" when she was pregnant. When she was not pregnant, he referred to her as "babe."

4. A comment about her breast size.

9. Comments about having sex in Vietnam.

12. A question on a Monday morning if she "got lucky" over the weekend and, if so, to tell him all about it.

16. A comment that he could see her through a window at work and that he

---

3. Defendants do not provide a state law analysis of Brandrup's claim under ORS 659.030 and instead imply that the disposition of that claim should be the same as the disposition of Brandrup's Title VII claim.

daydreamed about watching her through a bedroom window.

17. The comment "Don't wear red. It totally turns me on and I will be in the bathroom all day."

18. The use of gestures to suggest touching Brandrup on her seat.

In support of their argument that, as a matter of law, these incidents do not create a hostile environment, defendants cite decisions from three other federal circuit courts in which jury verdicts were reversed because the conduct alleged was not severe or pervasive enough to create a sexually hostile work environment. *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 823–24 (6th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997); *Baskerville v. Culligan Intern. Co.,* 50 F.3d 428, 431 (7th Cir.1995); *DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 595–96 (5th Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995). Defendants also cite a decision from this district in which summary judgment was granted on a hostile environment claim. *Weiss v. Market Transport,* Civ. No. 95–463–MA (D.Or. January 19, 1996) (unpublished opinion). Defendants argue that because the conduct in this case is not as severe or pervasive as the conduct in these four cases, summary judgment is appropriate here.

█ In each of the cases cited by defendants, almost all of the alleged inappropriate conduct consisted of remarks that were not directed at the plaintiff as an object of the supervisor's sexual interest. Consequently, the behavior fell within the nonactionable category of "merely offensive." In contrast, the relevant alleged conduct in this case, as set forth immediately above, demonstrates consistent, explicit sexual comments and behavior directed at Brandrup personally as an object of Starkey's sexual interest. Moreover, none of the cases cited by defendants included comments of the severity as Starkey's alleged comments regarding rape or Brandrup wearing red, and none involved the graphic details allegedly involved with Starkey's recollection of his exploits in Vietnam. Based on these considerations, combined with the humiliating nature of the alleged incidents, I disagree with defendants that it is clear, as a matter of law, that the alleged

harassment was not severe or pervasive. Furthermore, I find that a genuine issue of fact remains whether a reasonable person would find the work environment in which Brandrup worked to be hostile or abusive.

**B.** *Availability of Affirmative Defense*

Lattice argues that, even if the alleged harassment were so severe or pervasive as to alter the conditions of employment and create an abusive working environment, Lattice is not vicariously liable for Starkey's acts based on the affirmative defense announced by the Supreme Court in *Faragher, supra.* The Court stated in *Faragher:*

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successive higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. [citation omitted]. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher,* —— U.S. at —— – ——, 118 S.Ct. at 2292–93.

Lattice argues that it is entitled to this affirmative defense because (1) no tangible employment action was taken against Brandrup; (2) Lattice exercised reasonable care to prevent and correct promptly any allegedly sexually harassing behavior; and (3) Brandrup unreasonably failed to take advantage of preventive or corrective opportunities provided by Lattice.

### 1. *Tangible Employment Decision*

 I find that Lattice is eligible for the affirmative defense because no tangible employment action was taken against Brandrup. Brandrup argues that a tangible employment action occurred because her termination form was changed, after the investigation of her allegations was completed, to indicate that she is not eligible for rehire. This argument fails for two reasons. First, a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998). In other words, a tangible employment action occurs when a person is still employed, not weeks after an employee has resigned.

Second, in *Burlington,* the Supreme Court discussed the concept of tangible employment actions in the context of a harassing supervisor and noted that "Tangible employment actions are the means *by which the supervisor* brings the official power of the enterprise to bear on subordinates." *Id.* at 2269 (emphasis added). Likewise, the Court noted that "No affirmative defense is available, however, when *the supervisor's harassment* culminates in a tangible employment action . . . ." *Id.* at 2270 (emphasis added). There is no evidence or reasonable inference that supports the argument that Starkey's alleged harassment caused Brandrup's eligibility for rehire to change, or that any other action by him caused this result, especially since he apparently resigned only a few weeks after Brandrup.

### 2. *Reasonable Care by Lattice to Prevent and Correct Harassing Behavior and Brandrup's Use of Preventive or Corrective Opportunities Provided by Lattice*

Although Lattice is eligible for the affirmative defense set forth in *Faragher,* it has not met its burden of proof to have such a defense. Defendants argue that Brandrup unreasonably failed to report the alleged harassment to Lattice's Human Resources department. They point out that Brandrup testified that she knew that she did not have to report the harassment to Starkey or his supervisor, Ward, and instead could have reported the incidents to Human Resources. Defendants further argue that Brandrup knew that Lattice had an effective harassment policy and that it enforced that policy. Defendants' Reply, p. 11. It is on this point that defendants' argument fails.

 As noted above, there is no evidence in the record that Lattice had provided Brandrup with a copy of its sexual harassment policy or that she knew the terms of that policy. Although she knew that she could go to Human Resources, and that another employee had done so, there is no evidence that she was aware of the actual protections provided by the policy, especially regarding retaliation by her supervisor.[4]

As made clear in *Faragher,* an employer that does not disseminate its harassment policy to its employees cannot escape liability by faulting the employee for not following the complaint procedures in such policy. In *Faragher,* a lifeguard brought an action against her former employer and supervisors under Title VII for sexual harassment. She brought her action two years after she resigned and she had made no formal complaints of harassment while employed. Although the employer had adopted a sexual harassment policy during the time that the plaintiff was employed, it completely failed to disseminate it within the department in which the plaintiff was employed, such that her supervisors and many lifeguards were

---

**4.** The protections against retaliation are particularly important in a case such as this in which the plaintiff expresses fear of losing her job if she reports harassing conduct.

unaware of it. *Faragher,* —— U.S. at —— ——, 118 S.Ct. at 2280–81.

In holding that the defendant employer could not invoke the new affirmative defense that it had set forth, the *Faragher* court emphasized that the employer had failed to disseminate its policy against sexual harassment among its employees such as the plaintiff. As the court stated:

> Unlike the employer of a small workforce, who might expect that sufficient care to prevent tortious behavior could be exercised informally, those responsible for [the employer's] operations could not reasonably have thought that precautions against hostile environments in any one of many departments in far-flung locations could be effective without communicating some formal policy against harassment, with a sensible complaint procedure.

*Id.* at 2293. As in *Faragher,* Lattice has not shown that it was reasonable in its efforts to prevent sexual harassment, or that Brandrup was unreasonable in failing to file an internal complaint, when the very policy that set forth the necessary means and protections to make such a complaint was not made available to her. *See Nuri v. PRC. Inc.,* 1998 WL 458247, *11 (M.D.Ala. August 3, 1998) (finding that employer could not satisfy either prong of the *Faragher* affirmative defense when its antiharassment policy was not known to its employees). These facts also distinguish this action from the case relied upon by defendants, *Sconce v. Tandy Corporation,* 9 F.Supp.2d 773 (W.D.Ky.1998). In *Sconce,* the court specifically noted that the plaintiff knew of the employer's sexual harassment policy because the policy was provided to every employee in the company's Employee Handbook. *Id.* at 775.

It is important to note that even if Lattice had provided Brandrup with a copy of its sexual harassment policy, judgment in favor of Lattice could not be granted on this motion in light of Lattice's apparent response to Brandrup's complaints about sexual harassment on July 10, 1995. As noted above, Brandrup testified that at her meeting with Rowles and Clark on the morning of July 10, 1995, she told Rowles that Starkey had been sexually harassing her. Rowles undisputed response to that meeting was to send Brandrup to talk to Starkey directly about her complaints. Although Rowles contends that issues of sexual harassment were not discussed at that meeting, a genuine issue of material fact exists regarding whether Lattice was put on notice at that time about Starkey's alleged harassing behavior toward Brandrup.

Assuming, as I must, that Brandrup did raise the issue of sexual harassment with Rowles at that meeting, I cannot find that Lattice exercised reasonable care in correcting the alleged sexual harassment—a finding that is necessary for Lattice to benefit from the affirmative defense set forth in *Faragher.* Instructing an employee to voice complaints directly to the supervisor that is allegedly responsible for the harassing behavior would not be a reasonable response to an employee's concerns and would contravene the spirit, if not the terms, of Lattice's own sexual harassment policy. Based on this reason, and the reasons set forth above, I find that Lattice has not satisfied the requirements of the affirmative defense set forth in *Faragher.* Because I do not find that, as a matter of law, Brandrup's sexual harassment claims fail, summary judgment is denied as to those claims.[5]

---

**5.** I qualify this statement with the acknowledgment that Title VII liability extends only to employers and not employees. *Miller v. Maxwell's Intern.,* 991 F.2d 583, 587 (9th Cir.1993), *cert. denied,* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994). Thus, as even Brandrup concedes, summary judgment is appropriate as to her Title VII claim against Starkey. Brandrup argues that this limitation does not apply to her state law claim under ORS 659.030, however, and that such claim is viable against Starkey as an individual. Specifically, she cites ORS 659.030(1)(g), which apparently applies to employees who aid and abet unlawful employment practices. This district has ruled, however, that even if an individual employee could be named as a defendant and found liable under ORS 659.030(1)(g), summary judgment is appropriate against such a claim because the Oregon Revised Statutes provide no remedy against the employee defendant in such circumstances. *Logan v. West Coast Benson Hotel,* 981 F.Supp. 1301, 1318–19 (D.Or.1997). Accordingly, summary judgment is also appropriate as to Brandrup's state law harassment claim against Starkey.

## II. *Wrongful Discharge Claim*

In this action, Brandrup alleges that she was treated in a particular way by her supervisor because she is a woman. Based on such treatment and the work conditions it created, Brandrup felt the need to resign and, thus, she argues that she was constructively discharged. She further argues that such discharge is actionable under the common law tort of wrongful discharge.

Assuming, without deciding, that Brandrup can show that she was discharged, the circumstances surrounding such discharge do not support a claim for wrongful discharge. The evidence reveals that at no time before she submitted her written resignation did Brandrup file a complaint about sexual harassment or otherwise pursue her right to be free from harassment. Thus, notwithstanding her allegation in paragraph 14 of the Complaint that she suffered "retaliation for rejection of sexual harassment," Brandrup's claim for wrongful discharge is based on the alleged discriminatory treatment that she received because of her gender, not because she resisted such treatment on the job and was penalized or terminated in retaliation for such resistance.

■ In the context of sexual harassment, the Oregon tort of wrongful discharge is limited to situations in which a discharge resulted from an employee's *resistance* to discrimination, and does not cover the situation in which only a statutory right against discrimination has been violated, such as when a woman is discharged because of her gender. *Cross v. Eastlund,* 103 Or.App. 138, 141–42, 796 P.2d 1214 (allegation that plaintiff was discharged because of pregnancy was a discharge "because of sex," an unlawful act of sex discrimination under ORS 659.030, and did not state a claim for wrongful discharge), *rev. denied,* 310 Or. 612, 801 P.2d 840 (1990); *see also Goodlette v. LTM. Inc.,* 128 Or.App. 62, 66, 874 P.2d 1354 (1994) (acknowledging the distinction, in wrongful discharge context, between discharge for resisting discrimination versus discharge because of the discrimination itself); *Messick v. Horizon Industries, Inc.,* 62 F.3d 1227, 1231 (9th Cir.1995) (granting summary judgment against wrongful discharge claim because plaintiff proffered no evidence to show that he had suffered discriminatory treatment be-

cause he opposed employer's discriminatory practices); *Messer v. Portland Adventist Medical Center,* 707 F.Supp. 449, 454 (D.Or. 1989) (rejecting claim of wrongful discharge in which plaintiff alleged she was discharged because of her race, national origin, or religion). In short, Brandrup cannot maintain a claim for wrongful discharge on the basis that she was constructively discharged by and through defendants' alleged discrimination against her as a woman. Summary judgment is granted as to her wrongful discharge claim.

## III. *Intentional Infliction of Emotional Distress Claim*

### A. *Claim Against Lattice*

■ An employer is liable for an employee's tortious conduct if the employee acted within the scope of employment. *Mains v. II Morrow, Inc.,* 128 Or.App. 625, 631, 877 P.2d 88 (1994). Such a determination is made based on (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform. *Id.* (citing *Chesterman v. Barmon,* 305 Or. 439, 442, 753 P.2d 404 (1988)).

Lattice argues that Starkey was not motivated to serve Lattice when he allegedly sexually harassed Brandrup and that he was not hired to engage in that behavior. In *II Morrow,* the court addressed the same argument by an employer whose supervisor had allegedly sexually harassed an employee on the job. The court found that:

> [A]. factfinder could infer from the record that sexual harassment was a characteristic of the supervisor's method of supervising and controlling female subordinate employees in the workplace, and that defendant condoned this supervisory technique. [The supervisor] created a pervasive atmosphere of sexual harassment, was the subject of an earlier sexual harassment claim that the Bureau of Labor and Industries investigated, and was notorious within the company for discriminating against women. Despite the earlier com-

plaint and his reputation, defendant retained [the supervisor] in a supervisory role.

*Id.* at 633, 877 P.2d 88. On this basis, the court held that a factual question existed regarding whether the supervisor was motivated, at least in part, by a purpose to serve the employer and whether the subject acts were of a kind that the employee was hired to perform. Accordingly, the court held that the trial court had erred in dismissing the plaintiff's claim for intentional infliction of emotional distress ("IIED").

 In contrast to the facts of *II Morrow,* the record in this case does not support the inference that Lattice knew that Starkey had a tendency to be a harasser but decided to keep him as a supervisor anyway, or that it condoned his alleged behavior after being notified of it. Other than Brandrup's and Clark's comments, there is no evidence that other female subordinate employees experienced harassment from Starkey or that anyone at Lattice had previously made a complaint against Starkey for harassment. Based on the lack of any known history or reputation of harassing behavior, and the nature of the alleged behavior that Starkey directed toward Brandrup (and Clark), I see no basis for me or a jury to conclude that the Starkey's alleged behavior was motivated, even in part, by a purpose to serve Lattice or that the alleged comments and acts were of a kind that the Starkey was hired to perform. Accordingly, respondeat superior is not established and summary judgment is granted for Lattice as to Brandrup's IIED claim.[6]

**B.** *Claim Against Starkey*

 To prove a claim of IIED, a plaintiff must show that (1) the defendant intended to inflict emotional distress; (2) the defendant's conduct did, in fact, cause plaintiff to suffer severe emotional distress; and (3) the defendant's conduct involved an extraordinary transgression of the bounds of socially tolerable behavior. *McGanty v. Staudenraus,* 321 Or. 532, 543, 901 P.2d 841 (1995). Defendants argue that because Starkey's conduct did not exceed the bounds of socially tolera-

ble behavior, Brandrup's IIED claim must fail against him as well.

 For the same reasons that I am reluctant to find the Starkey's alleged conduct was not sufficiently severe and pervasive for purposes of a Title VII analysis, I am reluctant to conclude, as a matter of law, that his alleged conduct did not exceed the bounds of socially tolerable conduct. Based on the record, a jury could possibly find that such a threshold had been transgressed.

In reaching this conclusion, I am guided by precedent from the Oregon Court of Appeals. In *Whelan v. Albertson's, Inc.,* 129 Or.App. 501, 879 P.2d 888 (1994), the court noted that the use of sexually harassing language alone can be deemed socially intolerable. *Id.* at 505, 879 P.2d 888 (citing *Lathrope–Olson v. Oregon Department of Transportation,* 128 Or. App. 405, 408, 876 P.2d 345 (1994) (plaintiff told by supervisor that "all women were good for was between their legs")); *see also Steiner v. Showboat Operating Company,* 25 F.3d 1459, 1466 (9th Cir.1994) (noting that "while simple insults do not constitute intentional infliction of emotional distress, insults which include sexual or racial harassment may rise to that level."), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995).

Likewise, in *II Morrow, supra,* the court held that a jury could possibly find socially intolerable conduct when a supervisor had repeatedly harassed and demeaned a subordinate employee because of her gender, including through comments such as "bitch," "wench," and referring to the employee as a "sex-atary." *II Morrow,* 128 Or.App. at 627–30, 877 P.2d 88. Although the supervisor in *II Morrow* had also shoved and grabbed the employee, I find that the comments at issue in this case are sufficiently similar to, if not more egregious than, the comments made by the supervisor in *II Morrow,* such that I cannot conclude as a matter of law that Starkey's alleged conduct did not exceed the bounds of socially tolerable behavior. Summary judgment is denied as to the IIED claim against Starkey.

---

**6.** This decision also applies to the extent that Brandrup seeks to impose liability on Lattice directly for IIED based on Lattice's failure to follow-up with Brandrup regarding its investiga-

tion of her complaints against Starkey. Such conduct does not approach the type of socially intolerable conduct that is actionable under the tort of IIED.

## IV. Plaintiff's Motions

Brandrup has moved to reopen discovery, to compel discovery, and for sanctions. Brandrup seeks to take discovery regarding Starkey's employment history before he was employed by Lattice. In particular, she seeks to gather additional information about a complaint made against Starkey by a woman named Roxanne Harper when Starkey was employed at Precision Cast Parts. Brandrup seeks sanctions because defendants did not disclose such information during the discovery period.

Based on the briefs filed by Brandrup in opposition to the pending motion for summary judgment, she seeks the information about the past complaint or complaints against Starkey to demonstrate that Lattice failed to exercise reasonable care to prevent Starkey's alleged sexual harassing behavior at Lattice. Plaintiff's Supplemental Response, pp. 4–6. As discussed above, if Brandrup can successfully make such an argument, Lattice cannot benefit from the affirmative defense set forth by the Supreme Court in *Faragher, supra*.

For reasons that have nothing to do with Lattice's investigation of Starkey before it hired him, I have concluded that Lattice cannot invoke the *Faragher* affirmative defense. Given this ruling on the motion for summary judgment, the fact that discovery closed months ago, and that I find compelling defendants' argument that Lattice had no duty to inquire with Starkey's prior employers about sexual harassment complaints made against him, I exercise my discretion to deny plaintiff's motions.

## CONCLUSION

Defendants' motion for summary judgment (# 17) is GRANTED in part and DENIED in part. Specifically, as to plaintiff's First and Second Claims for Relief, for sexual discrimination, summary judgment is GRANTED as to defendant Starkey and DENIED as to defendant Lattice. As to plaintiff's Third Claim for Relief, for intentional infliction of emotional distress, summary judgment is GRANTED as to defendant Lattice and DENIED as to defendant Starkey. As to plaintiff's Fourth Claim for Relief, for wrongful discharge, summary judgment is GRANTED as to both defendants.

Plaintiff's motions to reopen discovery (# 39–1), to compel discovery (# 39–2), and for sanctions (# 39–3) are each DENIED.