**Donnie MANGRUM, Plaintiff,**

v.

**REPUBLIC INDUSTRIES, INC., Chuck Clancy Ford of Marietta, Inc., Scott Wilson, Defendants.**

No. 1:99–CV–3031–CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 10, 2003.

Mark L. Golder of Siegal & Golder, P.C., Atlanta, GA, for Plaintiff.

Christine E. Howard, Rebecca J. Jakubcin of Fisher & Phillips, LLP, Atlanta, GA, for Defendants.

### ORDER

MOYE, District Judge.

Plaintiff, Donnie Mangrum, filed this suit alleging Defendants, Republic Industries, Inc., Chuck Clancy Ford of Marietta, Inc., and Scott Wilson, sexually harassed her in violation of Title VII of the Civil Rights Act of 1964, as amended. Plaintiff's complaint included various state law causes of action. The case is before the Court on Plaintiff's motion for partial summary judgment on the issue of liability for her Title VII sexual harassment claim, on Defendants' motion for summary judgment as to all claims, and on Plaintiff's motion to amend the pleadings to name the real party in interest. For the reasons stated herein, the Court DENIES Plaintiff's partial motion for summary judgment, GRANTS Defendants' motion for summary judgment, and DENIES Plaintiff's motion to amend.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant Chuck Clancy Ford of Marietta, Inc. is referred to in the evidence before the Court as Chuck Clancy Ford, Marietta Ford, and Team Ford. The Court, for consistency, will refer to the automobile dealership as Chuck Clancy Ford or CCF. Likewise, Defendant Republic Industries, Inc., is also referred to as AutoNation, Inc., but will be referred to herein as Republic. Chuck Clancy Ford was purchased by Republic early in 1998, but the actual change-over took several months.

Plaintiff was employed as a used car sales representative at Chuck Clancy Ford. At the time of the incidents alleged in her complaint, she had been employed at CCF for more than fourteen years. Defendant Scott Wilson was originally employed at CCF as a new car sales representative. Early in 1998, Wilson was promoted to the position of assistant used car manager and, in September 1998, to the position of used car manager. In the used car department, Wilson was Plaintiff's supervisor. Ronnie Whitlock was general

manager of CCF and Wilson's direct supervisor.

On August 22, 1997, Plaintiff acknowledged in writing receiving a copy of the CCF Employee Handbook. In the written acknowledgment, Plaintiff agreed "to read this Employee Handbook promptly, after which, I agree to immediately ask my manager to explain to me any part of this Employee Handbook which I do not fully understand" and "not to institute any legal action against Company until and unless I have exhausted all administrative remedies with Company." The handbook Plaintiff received in 1997 contained the following "NO HARASSMENT POLICY":

Chuck Clancy Ford does not tolerate harassment of our employees. It shall be the duty of any employee who believes that he or she has been the object of any form of harassment related to his or her race, color, gender, religion, national origin, age, disability or marital status to promptly and fully report the situation to management. If you feel uncomfortable about reporting the matter to your manager, you may instead contact any other member of management or any officer of the Company. Once notified, we will investigate the charge and take all necessary steps to eliminate the problem. This open-door policy of communication best ensures close contact between you and top management on a work-related issue of gravest concern....

The term harassment includes, but is not necessarily limited to, slurs, jokes, other verbal, graphic or physical conduct related to an individual's race, color, gender, religion, national origin, age, disability or marital status. Harassment also includes sexual harassment which is defined as follows:

Unwelcome sexual advance, requests for sexual favors and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

a) Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment.

b) Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual.

c) Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Any repeated or unwarranted verbal or physical sexual advances, sexually explicit derogatory statement or sexually discriminatory remarks made by someone in the workplace that are offensive or objectionable to the recipient, cause the recipient discomfort or humiliation or interfere with the recipient's job performance.

Plaintiff acknowledged that this policy was still applicable during the times at issue in this action.

Foul language, sexual innuendo, and dirty jokes were routine in the used car department at CCF. Plaintiff acknowledged not only that she participated in the sexual banter, but that she used bad language and was "one of the guys ... in there with the best of them talking trash" throughout her tenure at CCF. Plaintiff stated, "I've got a pretty broad mind. I've heard a lot of things. I participated in a lot of the things that were said there." Plaintiff acknowledged that she sat on other employees' laps and rubbed their shoulders and that she gave scalp, neck, shoulder and back massages to various employees and would scratch their backs and ask for the same in return. Words like "ass" and "prick" and com-

ments like "fuck it" were used "all the time" in the used car department.

When Ronnie Whitlock first arrived as general manager at CCF in July 1998, he "noticed there seemed to be a disregard towards the 'Sexual Harassment policy' in the current employee handbook." One of his "first acts was to make every employee aware of our corporate policy regarding harassment of any kind." During a sales meeting in either July or August 1998, which was attended by Plaintiff, he "made it clear to each and every employee that Chuck Clancy Ford had a zero tolerance policy regarding violations of the No Harassment Policy." He told employees that if anyone had a grievance of any kind he maintained an open door policy. He further stated that his home phone number was listed and he could be called after hours. He also told them that, if they felt uncomfortable talking to him, they were welcome to talk to Margaret Callahan, comptroller. Either he or Callahan were almost always at the dealership.

Plaintiff alleges that Wilson, after his promotion in September 1998, "began a regular practice of verbal and physical sexual assault." Specifically, Plaintiff alleges Wilson asked her for oral sex, said that she could make more money on her car sales if she would accept his sexual overtures, sexually propositioned Plaintiff's daughter in front of Plaintiff, frequently used foul language around all employees, hugged her, patted her buttocks, and, on one occasion, exposed himself to her. Plaintiff further alleges she lost sales because Wilson retaliated against her for refusing his sexual requests. Plaintiff alleges that, after Wilson exposed himself to her, she was unable to return to work because of the hostile environment. Finally, Plaintiff alleges that, after she left CCF but was still on medical leave, someone at the dealership told some of her customers

that she was no longer in the automobile business.

Plaintiff bases her complaint on the following alleged incidents:

(1) On several occasions, Wilson was inappropriately provocative by saying she couldn't leave early because she needed to stay at the dealership with him. She acknowledged, however, that she was never alone at the dealership with Wilson, that she actually needed to stay and work, and that Wilson's comments were not really offensive, but she didn't want to stay by herself with him.

(2) On two different occasions, Wilson came into her office and said "to stretch out on the desk, lay back on the desk, we'll knock out a little piece right quick." She replied, "No, not right now, no, I'm busy, I have a customer coming, no, leave me alone." Either she or Wilson then left the office.

(3) Plaintiff was working with the Rutherfords on a vehicle deal. Prior to their coming to the dealership, Plaintiff had "chosen a vehicle for them to lease based on the information they had provided to me. I had previously discussed with Mr. Wilson their trade-in and had given him all of the vital information on the vehicle so that I could structure their deal. Based on the trade-in quote from Mr. Wilson, I quoted the Rutherfords a monthly lease payment. When Mr. Wilson stepped outside to visually inspect the trade-in vehicle, he stated he was cutting the appraisal by about $1,000.00, but he also asked what I was willing to do for him physically to allow the deal to go forward as it had been quoted." Plaintiff returned to her office and told the Rutherfords that the deal was no longer available.

(4) While on a test drive in a vehicle belonging to the Wilkes, Wilson asked what the payoff was on the vehicle and

then said, "What's in it for me? If you want to give me a blow job, we can go right over here at Life College, it won't take but a minute, and we'll put this deal together. It will work out for me and you both." Prior to the Wilkes' arrival with the trade-in vehicle and prior to Wilson's driving the vehicle, Wilson had given Plaintiff an appraisal value of the vehicle. In response to Wilson's comments, Plaintiff "told him, no, he was stupid." Wilson then laughed "his stupid little laugh that he always makes." Wilson changed the appraisal value of the trade-in vehicle, causing Plaintiff to lose the deal.

(5) Plaintiff was trying to work a trade-in with the Chessers. Wilson asked Plaintiff to set him up with Ms. Chesser. Plaintiff refused and the deal fell through.

(6) Plaintiff was trying to work a trade-in with the Jennings. Wilson came over to the Jennings' vehicle and said to Plaintiff, "What is it, freak? They can't trade. They ha[ve]n't had it long enough. What's in it for me?" The Jennings heard Wilson's remarks. The deal fell through.

(7) On November 8, 1998, a rainy Sunday afternoon, Plaintiff was sitting in a van in the used car parking lot, watching a football game, and waiting for customers. At various times during the afternoon, other sales representatives came in and out of the van. Late in the afternoon, when the van was occupied only by Plaintiff, Wilson entered the van and closed the door. After he got in the van, Wilson pulled down the blinds and propositioned Plaintiff for sex. When she refused, Wilson unzipped his pants and exposed himself to her. Wilson was "sitting in a captain's chair beside [Plaintiff] leaned back, not laying back but leaned back." At times while his penis was out of his pants, Wilson had "his hands on top of himself ... messing around." Plaintiff felt as if she were trapped in the van by Wilson because she was afraid to move. She was afraid that if she tried to open the door or get out Wilson would be right on top of her. After Plaintiff left the van, she got her purse, left the dealership, and never returned. The incident was recorded by Plaintiff who started the recording as Wilson approached the van and ended it when he left.

Plaintiff was able to record the conversation in the van because she had been carrying the recorder around with her for several days hoping to record a conversation with Wilson. She had been advised to record Wilson's comments by a women she met in a cosmetic studio. Plaintiff later learned that the woman who advised her to record Wilson was an attorney.

The recording was submitted as evidence, as was a transcript of the recording. Throughout the conversation, Plaintiff laughed, teased, and joked with Wilson. Although she did change the topic of conversation, the recording does not reflect that she attempted to end the conversation or leave the van. On one occasion when Wilson suggested he would leave the van, Plaintiff encouraged him to stay by continuing the conversation. Although Plaintiff stated that she was "scared," the surrounding conversation suggested that she was joking. At one time, when Plaintiff said "It's scary," Wilson laughed and responded, "Is that what it is? I don't see you being scared of it personally whose to say that." At which point, Plaintiff just laughed. At one point, Wilson suggested, "You need a quickie, don't you." Plaintiff's first response was, "I don't think so," in a joking tone of voice. When Wilson asked, "That would tire you out, wouldn't it?", Plaintiff replied, "It might. I hadn't had one in a long time.... I hadn't had one in a while, maybe that's what I need." The conversation finally ended when Wilson was paged and left the van.

Following the November 8, 1998, incident, Plaintiff asked for and was granted leave under the Family and Medical Leave Act through March 29, 1999. She was terminated on March 30, 1999, for "failure to return to work."

Plaintiff understood that the CCF sexual harassment policy applied to her in the fall of 1998 but she didn't complain to anyone except other salespersons because the management people she would have reported the harassment to were no longer employed at the dealership and "the people that was there I wouldn't report it to because they had a problem themselves... and ... wouldn't have done anything about it." Plaintiff testified that she believed she would lose her job if she complained. But she also admitted that she didn't know what would have happened to her if she had gone to management over Wilson's head and complained. Plaintiff stated, "It was a game. You went along with it. You did the best that you could. That's what I had to do in order to keep my job.... You have to go along with the game. You just have to go along with it. And that's what I done with [Wilson]."

Plaintiff had sometimes been unable to work deals with Wilson when he was the assistant used car manager, but had just gone to the used car manager. She does not allege that her inability to work deals with Wilson while he was assistant manager was based on sexual harassment. Plaintiff did not always take Wilson's comments to her as serious overtures and invitations to engage in sex: when Wilson made comments to her like "I know what you need" or "I would like to give you a good fucking" she didn't always believe that he meant them, but sometimes she got scared. "[W]ith [Wilson] you never knew" if he was really suggesting a sexual encounter or if he was just making a rude comment. When Wilson made this type of comment in front of other people, she "just

[took] it with a grain of salt and [went] on." Plaintiff testified that Wilson patted her buttocks two or three times, that she was offended by it when she was by herself with him, but she was comfortable with it when there were other people around. She admitted, however, that Wilson "probably didn't" know when it was offensive and when it was not offensive. Most of the time she took Wilson's comments and actions "with a grain of salt and went on unless I got mad at him and said, pervert why don't you leave me alone ... normally I'd just, you know, ha, ha, kept going ... laugh[ ] it off and went on with it, just let it go." Plaintiff specifically acknowledged that during the time between September and November 1998, the time about which she complains, she hugged Wilson, she gave him back rubs and massages, and she scratched his back, just as she did for other employees.

Defendants had no knowledge that Plaintiff believed she had been subject to sexual harassment until they received a demand letter written to the corporate defendants by Plaintiff's attorney on December 1, 1998. The letter stated:

> We represent Ms. Donnie Mangrum, a salesperson for your dealership for over fourteen years. During this time she has been a valuable representative of Chuck Clancy Ford, now Marietta Ford, selling new and used cars.

> This letter is to advise you of the claims that my client is making against your dealership for the sexual harassment, the assault and battery, the intentional infliction of emotional distress, the negligent hiring and the hostile work environment created in the workplace by Scott Wilson. As a result of the totally inappropriate behavior condoned by your dealership and the hostile environment created by Scott Wilson, my client has experienced emotional trauma, pain,

suffering and has been deprived of bonuses, sales and lost income.

Soon after Mr. Wilson was promoted by you to be a used car manager, he began his verbal and physical assault on Ms. Mangrum. He would constantly come into her office and close the door and proposition her for sex. In exchange for sexual favors, he made it clear that Ms. Mangrum could make more money and sell more cars. Not satisfied with Ms. Mangrum's refusals, he would insist that Ms. Mangrum go on test rides with him while he was evaluating a car for a trade in. During the test drives, Mr. Wilson would state that he would offer the customer more for the trade if Ms. Mangrum would perform sexual favors. Obviously, if Mr. Wilson did not offer enough on the trade, the sale might not be consummated and Ms. Mangrum would not make a commission. On each occasion, Ms. Mangrum refused his demands for sexual favors and, in some instances, Ms. Mangrum lost the sale. This would not only cost her the sale and her commission, in some instances, the lost sale would cost her a bonus for the month.

This inappropriate behavior has been going on since approximately September of this year. Your sales manager even went so far as propositioning Ms. Mangrum's nineteen year old daughter recently as he asked her to jump over his desk and "do something with her jaws."

Needless to say, this type of activity and behavior left Ms. Mangrum alone and confused. She had no one to turn to. Her supervisor was Mr. Wilson and she certainly could not turn to him. Your company has never provided her with an employee manual or handbook. Additionally, Mr. Wilson's superior, Rick Robinson, is suspected of having a history of dealing inappropriately with women. It is our understanding that he and the dealership were involved in a dispute with a female who alleged he inappropriately fondled her. Furthermore, we understand that the dealership fired Mr. Robinson, or forced him to resign, and he came back to work for your dealership after the controversy subsided. This could hardly be the individual Ms. Mangrum could turn to in her time of her need.

Nevertheless, Ms. Mangrum continued to endure this behavior but the final straw came on a Sunday afternoon on November 8, 1998. At that time my client was sitting in a parked van on the used parking lot waiting for customers to come into the lot. She was watching a football game and at various times she had been accompanied in the van by other sales representatives. The weather was rainy that day and there was no business going on and some of the other sales representatives left. As soon as the van was only occupied by Ms. Mangrum, within five minutes Mr. Wilson entered the van and closed the door. He pulled down the blinds and propositioned Ms. Mangrum for sex once again. Not satisfied with the lack of progress he was making with Ms. Mangrum, Mr. Wilson decided to take a different approach and exposed himself to her. Ms. Mangrum was dumbfounded and shocked at this vulgar and lewd behavior that occurred on your parking lot during sales hours while Ms. Mangrum was trying to make a living. Ms. Mangrum did not know what to do and was stuck in the van for several minutes calmly trying to make sure the situation did not turn in to a catastrophic event. Once again, Ms. Mangrum refused Mr. Wilson. Once Mr. Wilson left the van my client quietly gathered herself and went home.

Since that crude act occurred, Ms. Mangrum has been under the care of professionals who are assisting her in

trying to deal with the situation. Distraught and emotionally spent, Ms. Mangrum is not able to return to work. She has no intention of ever returning to work for you as long as this behavior is condoned by your dealership and as long as Mr. Wilson is employed by you.

My client is a single female and the sole provider for her family. She has performed for your dealership in a professional manner and is good at what she does. She loved her job and was successful at it. She never was one to miss work or sick out. However, she is not in a position to work as a result of this behavior conducted in an atmosphere you have supported in the name of profit.

We intend to pursue your dealership for your behavior and the sexual harassment Ms. Mangrum has endured. You have utterly failed to provide Ms. Mangrum with a hostile free work environment. The fact that your dealership promotes such individuals and re-hired Rick Robinson certainly adds a claim for negligent hiring that we intend to add against your dealership. We have reason to believe that Mr. Wilson has a history of this type of behavior which you knew, or should have known, had you conducted a meaningful background check.

My client has experienced severe emotional problems since this episode and the extent of these problems are unknown at this time. My client has been out of work for several weeks and is not able to earn a living because of these acts which your dealership has condoned. We intend to hold you accountable for the loss of income and for the nightmarish experiences she has had to endure and the pain and suffering you have caused her. The callous disregard for her feelings and rights have exposed your company to a claim for intentional infliction of emotional distress as well.

All of the claims will be asserted as well as our claim for punitive damages.

We are going to withhold our EEOC filing in order to give you an opportunity to respond to these allegations. We expect to hear from you no later than Friday, December 11, 1998, as to what your position is going to be in this matter and how you intend to remedy this intolerable situation. While my client's preference is to deal with this matter quietly and discreetly, we intend to move forward with our claims if your response is inadequate.

The demand letter was hand-delivered to the dealership on December 1, 1998, and received by Whitlock. He immediately sent a copy to Bill Callahan at the district office and waited to be told what to do. Upon instructions from Callahan, Whitlock sent the letter to Scott Lieberman, in-house legal counsel for Republic. Although Whitlock did nothing other than observe Wilson's conduct until he received instructions from the legal department, he was in contact with Chris Fowner and then Janet Crockett in the legal department at corporate headquarters in Florida. Late in January 1999, Crockett gave Whitlock permission to interview Wilson. The delay in getting instructions on how to proceed occurred because Fowner, who was initially handling the situation, was pregnant and had her baby during that time.

In a letter dated December 3, 1998, Crockett, counsel for Republic, responded to Plaintiff's counsel, stating that his letter "was routed to me for investigation and response in anticipation of suit" and that she would contact him after an investigation had been concluded.

On December 21, 1998, Plaintiff's counsel sent Crockett a letter acknowledging receipt of her letter, but expressing concern that "it has been three weeks since my letter and we have had no response

from anyone other than your form letter." He stated:

> I find [your failure to respond] unbelievably cold and callous on the part of your company, but I know that is how you got to be a big as you are. I know that a company your size cares very little if an EEOC complaint is filed against them and gives little thought to these types of complaints. Therefore, based on your total lack of response to our situation, we are going to file the EEOC complaint.

Plaintiff's counsel further stated, "While you have every right to conduct an investigation, I would remind you that your company has deprived Ms. Mangrum of her livelihood for almost 2 months." Finally, he stated that he "would appreciate hearing from you" when the investigation was complete.

Sometime in December 1998, before he had been told of the letter by anyone at CCF, Wilson heard rumors from people at other dealerships about the claims Plaintiff was making. He went to Whitlock to ask what was going on. Whitlock advised him not to do or say anything until the legal department told them what to do. Wilson was specifically advised not to try to contact Plaintiff. Although he observed Wilson and the used car department, Whitlock did nothing else because Plaintiff was no longer at work and was, therefore, not subject to the continuing harassment alleged by her attorney. Whitlock decided to do and say nothing until he got instructions from the legal department because he had found through experience that taking the wrong action could lead to gossip that might injure either Plaintiff or Wilson.

Whitlock interviewed Wilson about Plaintiff's allegations on January 29, 1999, and began by showing Wilson the initial letter from Plaintiff's counsel. At that time, neither Whitlock nor Wilson were aware that the conversation of November 8, 1998, had been recorded. Wilson did not deny the conversation, stating that he and Plaintiff always said "stuff like that to each other," but he denied exposing himself and denied anything at all with Plaintiff's daughter. Whitlock then asked Wilson to write him a memo describing the van incident. In a memo to Whitlock dated February 3, 1999, Wilson stated:

> Before I challenge any of the accusations proposed by Miss Mangrum, I must first say that I can't recall exactly what was said because these comments were made between myself and Miss Mangrum in a mutual and non verbatim context. But, what was said, or implied in a sexual manner, by both of us, was not to be taken literally, as I surely did not. . . . They were simply mutual innuendoes made by both of us in the course of friendship and business. . . . There were never any impure, implicative, sexually suggestive contact, or thoughts of any kind. . . .

Wilson continued, describing other actions of Plaintiff which, he alleged, he and "countless others" had witnessed. He indicated that he was well aware of the sexual harassment policy stated in the employee handbook and believed Plaintiff had several managers to whom she could have reported any sexual harassment. He concluded by stating that he was prepared to fight Plaintiff's allegations if necessary.

Although he did not mention Plaintiff's specific allegations, Whitlock interviewed several other employees of the dealership about the possibility of sexual harassment and about the actions of Plaintiff and Wilson. He did not contact Plaintiff about her allegations because she was represented by counsel at that time. As a result of his investigation, Whitlock believed that the conversation in the van was mutual sexual banter.

A copy of Wilson's response was sent to Crockett. After Crockett reviewed Wilson's response, the decision was made to put a write-up in Wilson's file. This decision was based on Wilson's admitting to the sexual conversations with Plaintiff. The write-up stated:

> We have conducted a thorough investigation of allegations of perceived sexual harassment. You have denied certain allegations, including soliciting sexual favors. It appears that you and Ms. Mangrum have each engaged in co[n]versations that are not appropriate in the workplace setting. Such conversations are to cease immediately. We have reviewed the sexual harassment policy with you. Further, the Company strictly prohibits any acts of retaliation against an associate for making an allegation of harassment. If you violate the sexual harassment or no retaliation policy, you will be subjected to further dis[c]iplinary action, upto and including separation from employment.

The write-up was signed by Whitlock on March 15, 1999, and by Wilson on March 18, 1999. At the time Wilson signed the write-up, Whitlock made it clear that the incident was very serious and should never happen again. He warned Wilson that, even if someone is your friend, a conversation such as that Wilson admitted to could create problems and could be very damaging. Whitlock also made sure Wilson understood the written warning and its caution about what would happen if a similar situation occurred in the future.

Also on March 18, 1999, Plaintiff filed an EEOC charge of discrimination based on sex. She filed this action on November 23, 1999, seeking to recover for sexual harassment, assault and battery, wrongful hiring and retention, intentional interference with business relations, intentional infliction of emotional distress, and negligent infliction of emotional distress.

## LEGAL STANDARDS AND ANALYSIS

### I. *Summary Judgment*

Courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether the moving party has met its burden, the court views the evidence in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg–Warner Acceptance Corp. v. Davis*, 804 F.2d 1580, 1582 (11th Cir.1986), "and all justifiable inferences are to be drawn in his favor," *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987). "For factual issues to be considered genuine, they must have a real basis in the record." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir.1993). Additionally, issues of fact are genuine only if "they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The unsupported, self-serving statements of the party opposing summary judgment are insufficient to avoid summary judgment. *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir.1984). "In passing upon a motion for summary judgment, a finding of fact which may be inferred but not de-

manded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." *Brewer v. Southeastern Fidelity Ins. Co.*, 147 Ga.App. 562, 564, 249 S.E.2d 668 (1978) (citations omitted). The moving party's failure to meet this initial burden ends the inquiry, and summary judgment should be denied.

Once the moving party has met this initial burden, the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir.1991). Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249–50, 106 S.Ct. 2505.

## II. *Title VII*

■ Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting 42 U.S.C. § 2000e–2(a)(1)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 77, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ "The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act." *Smith v. Lomax*, 45 F.3d 402, 403–04 n. 4 (11th Cir.1995) (quoting *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991)). An employer may be held liable for the discriminatory acts of a supervisory employee if the employer has actual knowledge of the acts and does nothing to stop them, *Faragher v. City of Boca Raton*, 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing *Oncale*, 523 U.S. at 77, 118 S.Ct. 998), if the supervisor is sufficiently high within the management of the company that his actions may be imputed to the employer, *id.* (citing *Harris*, 510 U.S. at 19, 114 S.Ct. 367), or if the discriminatory action has tangible results, "like hiring, firing, promotion, compensation, and work assignment," *id.* at 790 (citing *Meritor Savings Bank*, 477 U.S. at 70–71, 106 S.Ct. 2399).

An employer's potential liability may be subject to an affirmative defense.

When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Id.* at 807–08, 118 S.Ct. 2275 (internal citations omitted); *Burlington Industries,*

*Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

■ The Supreme Court has distinguished between "quid pro quo" and "hostile work environment" discrimination claims and has acknowledged that both are cognizable under Title VII. *Ellerth,* 524 U.S. at 752, 118 S.Ct. 2257. "The principal significance of the distinction is to instruct that Title VII is violated by either explicit [quid pro quo] or constructive [hostile environment] alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive." *Id.* at 752, 118 S.Ct. 2257 (citing *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. 2399). Although the terms "are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, ... beyond this [they] are of limited utility," *id.* at 751, 118 S.Ct. 2257, and "are not controlling for purposes of establishing employer liability." *Id.* at 766, 118 S.Ct. 2257.

**A.** *Hostile Environment*

To establish a hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, an employee must show: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir.1999) (citing *Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th

Cir.1982)), *cert. denied,* 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000).

■ "Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." *Id.* (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21–22, 114 S.Ct. 367 (emphasis added). *See also, Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[I]n order to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.").

[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant ... [b]ut no single factor is required.

*Harris,* 510 U.S. at 23, 114 S.Ct. 367. "The real social impact of workplace behavior often depends on a constellation of

surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82–83, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish ... conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Id.* at 83, 118 S.Ct. 998. Therefore, the existence of sexual harassment must be determined "in light of 'the record as a whole' and 'the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R. § 1604.11(b)). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances and requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 118 S.Ct. at 1003 (internal punctuation omitted).

 "In order to constitute harassment, ... this conduct must [also] be 'unwelcome' in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Morgan v. Fellini's Pizza, Inc.*, 64 F.Supp.2d 1304, 1309 (N.D.Ga.1999) (citing *Henson*, 682 F.2d at 903). "In determining whether conduct was unwelcome, the nature of the sexual advances and the context in which they occurred are to be viewed in light of the totality of the circumstances at issue." *Id.* "In looking at the entire context of the alleged harassment, a plaintiff's provocative speech or dress may be relevant." *Id.* "It does not follow, however, that the 'use of foul language or sexual innuendo in a consensual setting' waives that plaintiff's legal protections against unwelcome harassment." *Id.* at 1309–10 (quoting *Nuri v. PRC, Inc.*, 13 F.Supp.2d 1296, 1301 (M.D.Ala.1998)).

### B. Quid Pro Quo

 "An employer may not require sexual consideration from an employee as a quid pro quo for job benefits." *Henson v. City of Dundee*, 682 F.2d 897, 908 (11th Cir.1982). To prove quid pro quo sexual harassment, a plaintiff must show: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the employee's reaction to harassment complained of affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; and (5) respondeat superior. *Id.* at 909. "The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment." *Id.* "[T]he employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision." *Id.*

### C. Employer Liability

 [W]hen analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate [harassment] cases into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions.

*Frederick v. Sprint/United Mgt. Co.*, 246 F.3d 1305, 1311 (11th Cir.2001) (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761–63, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 790, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). "Under this analysis, when a supervisor engages in harassment which results in an adverse 'tangible employment action' against the employee, the employer is automatically held vicariously liable for the harassment." *Id.* (citing *Ellerth*, 524 U.S. at 763, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 790, 118 S.Ct. 2275). "In contrast, when the supervisor's harassment involves no adverse 'tangible employment action,' an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the *Faragher* and *Ellerth* cases." *Id.* (citing *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275).

■ "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257. "When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation." *Id.* at 761–62, 118 S.Ct. 2257. "As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury." *Id.* at 762, 118 S.Ct. 2257. "Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control." *Id.* "A tangible employment decision requires an official act of the enterprise, a company act." *Id.* "The decision

in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* "The supervisor often must obtain the imprimatur of the enterprise and use its internal processes." *Id.*

■ "In order to prevail on a claim of sexual harassment when no adverse 'tangible employment action' is taken, a plaintiff must present sufficient evidence to show that the harassment she suffered, objectively and subjectively, was severe or pervasive." *Frederick*, 246 F.3d at 1313 (citing *Gupta v. Florida Bd., of Regents*, 212 F.3d 571, 582–83 (11th Cir.2000), *cert. denied*, 531 U.S. 1076, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001)). "If the plaintiff satisfies her burden, the defendant-employer is entitled to assert the *Faragher/Ellerth* affirmative defense." *Id.* (citing *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257).

■ "[A] defending employer may raise an affirmative defense to liability or damages" "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" by proving two necessary elements: (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. A defendant employer must satisfy both elements to avoid liability and bears the burden of proof on both elements. *Frederick*, 246 F.3d at 1313.

While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the

employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275, *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

"The first element of the *Ellerth/Faragher* defense, that the employer exercised reasonable care to prevent and promptly correct harassing behavior, involves two parts: the prevention and the prompt correction of harassing behavior." *Walton v. Johnson & Johnson Services, Inc.*, 203 F.Supp.2d 1312, 1322 (M.D.Fla. 2002). "[A]s to the first part of the first element of the *Faragher/Ellerth* affirmative defense, an employer does not always have to show that it has a formal sexual harassment policy to meet its burden of proof on this element." *Frederick*, 246 F.3d at 1313–14 (citing *Lissau v. Southern Food Serv.*, 159 F.3d 177, 183 (4th Cir. 1998) ("recognizing that small employers may show that they exercised reasonable care to prevent and correct sexual harassment through more informal complaint mechanisms")). "At the same time, an employer's showing that it has a sexual harassment policy does not automatically satisfy its burden." *Id.* at 1314 (citing *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275 ("denying an employer the affirmative defense because although it had a sexual harassment policy it had 'entirely failed to disseminate that policy'")). "As to the second part of the first element of the *Faragher/Ellerth* affirmative defense, an employer need not act instantaneously, but

must act in a reasonably prompt manner to respond to the employee's complaint." *Id.* (citing *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1302 (11th Cir.), *cert. denied*, 531 U.S. 926, 121 S.Ct. 303, 148 L.Ed.2d 243 (2000)).

"As to the second element of the defense, an employer's showing that the plaintiff-employee failed to follow its complaint procedures will often be sufficient to satisfy its burden." *Id.* (citing *Madray*, 208 F.3d at 1302 ("explaining that amorphous complaints to persons not authorized to accept complaints constituted evidence that the employee unreasonably failed to take advantage of her employer's complaint procedures"); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1365 (11th Cir.1999) ("same")). "[I]n some cases, the proof will show that the employee's noncompliance was reasonable under the circumstances and, in these cases, the defendant cannot satisfy the second element of the affirmative defense." *Id.*

"A generalized fear of retaliation does not excuse a failure to report sexual harassment." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267 (4th Cir.2001). *See also, Madray v. Publix Super Markets, Inc.*, 30 F.Supp.2d 1371, 1376 (S.D.Fla.1998) ("To permit an employee to disregard a policy of which she was admittedly aware based on generalized fears would require an employer to be automatically liable for harassment committed by a supervisor. This is a result which the Supreme Court expressly sought to avoid."), *aff'd, Madray*, 208 F.3d at 1293.

> Instead, the law is specifically designed to encourage harassed employees to turn in their harasser because doing so inures to everyone's benefit. Reporting the harasser benefits the victim by allowing the company to halt future harassment. It benefits others who

might be harassed by the same individual, and it benefits the company by alerting it to the disruptive and unlawful misconduct of an employee. Thus, the reporting requirement serves the "primary objective" of Title VII which "is not to provide redress but to avoid harm." *Barrett*, 240 F.3d at 267 (quoting *Faragher*, 524 U.S. at 806, 118 S.Ct. 2275). "Furthermore, Title VII expressly prohibits any retaliation against [an employee] for reporting ... harassment." *Id.* (citing 42 U.S.C. § 2000e–3(a).) Additionally, "[a]n employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer." *Id.* at 268. "Allowing subjective fears to vitiate an employee's reporting requirement would completely undermine Title VII's basic policy 'of encouraging forethought by employers *and* saving action by objecting employees.'" *Id.* at 286 (quoting *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 764, 118 S.Ct. 2257) (emphasis in *Barrett*). "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir.1999) (internal punctuation omitted), *cert. denied*, 528 U.S. 1076, 120 S.Ct. 790, 145 L.Ed.2d 666 (2000). "While a victim of sexual harassment may legitimately feel uncomfortable discussing the harassment with an employer, that inevitable unpleasantness cannot excuse the employee from using the company's complaint mechanisms." *Id.* "[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Id.*

"Where [a] plaintiff seeks to hold the employer responsible for the hostile environment created by the plaintiff's supervisor or coworker, she must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir.1982). "The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* (internal citations omitted). "The 'remedial action' must be reasonably likely to prevent the misconduct from recurring." *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir.1996) (internal quotation marks omitted), *reh'g, en banc, denied*, 105 F.3d 673 (1997).

When an employer has "promulgated a sexual harassment policy specifying the steps a victimized employee should take to alert the employer of harassment," the employer is "deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures" when the employee who alleges harassment makes "reasonably sufficient use of the channels created by [the] policy." *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir.1999).

At the same time, the power and influence of an employer over the atmosphere in a workplace cannot be overstated. The whole point of recognizing hostile work environment sexual harassment as a form of workplace discrimination under Title VII is that employees are entitled to a work environment that allows them to function effectively and to do the work they were hired to per-

form to the best of their ability without having to run a gauntlet of sexual abuse or face other forms of discrimination. *Id.* at 1366 (internal quotation marks omitted). "When an employee's ability to perform his or her job is compromised by discriminatory acts including sexual harassment and the employer knows it, it is the employer that has the ability, and therefore the responsibility, to address the problem, whether the harasser is a supervisor, a co-worker, a client, or a subordinate." *Id.*

### D. Constructive Discharge

 The Eleventh Circuit has "long recognized that constructive discharge can qualify as an adverse employment decision" for purposes of discrimination claims. *Hipp v. Liberty National Life Ins. Co.,* 252 F.3d 1208, 1230 (11th Cir.2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1064, 151 L.Ed.2d 968 (2002). Nevertheless, "[t]he threshold for establishing constructive discharge ... is quite high." *Id.* at 1231. In evaluating constructive discharge claims, courts do not consider plaintiffs' subjective feelings but employ instead an objective standard. *Id.* "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in his position would have been compelled to resign." *Id.* (internal punctuation omitted). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Id.* Before finding a constructive discharge, the Eleventh Circuit requires "pervasive conduct by employers," *id.,* and "a high degree of deterioration in an employee's working conditions." *Hill v. Winn–Dixie Stores, Inc.,* 934 F.2d 1518, 1527 (11th Cir.1991).

 "A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir.1996), *reh'g, en banc, denied,* 105 F.3d 673 (1997). "Obviously an employer cannot be given sufficient time to remedy, for example, a hostile environment, if it is not provided notice of it." *Jones v. USA Petroleum Corp.,* 20 F.Supp.2d 1379, 1383 (S.D.Ga.1998).

> Given the pivotal importance notice plays in supervisor sexual harassment cases, [courts have found] that ... plaintiffs neutralize[ ] their constructive discharge claims by not notifying their employer of their problems.... To hold otherwise would allow a constructive-discharge claiming employee to procedurally bypass her employer's grievance procedure and deprive it of the *Ellerth/Faragher* affirmative defense. That would simply moot the employer's preventive and corrective efforts, and gut *Ellerth/Faragher's* goal of encouraging sensible grievance procedures.

*Id.* at 1384. "The notice must be sufficient to afford an employer with a reasonable opportunity to remedy the problem." *Jones,* 20 F.Supp.2d at 1385.

### E. Analysis

Plaintiff cannot sustain her Title VII claims against Wilson individually. *See, Smith v. Lomax,* 45 F.3d 402, 403–04 n. 4 (11th Cir.1995).

 Plaintiff cannot succeed on her hostile environment claims. Because Plaintiff participated in and, in some instances, initiated inappropriate language and activity at CCF, she cannot show that Wilson's actions, other than his alleged exposing himself to her, were unwelcome. *See, Reed v. Shepard,* 939 F.2d 484, 491–92 (7th Cir.1991) (noting that the plaintiff's "preferred method of dealing with co-workers was with sexually explicit jokes, suggestions and offers," the court upheld the district court's finding that "language

and sexually explicit jokes were used around plaintiff because of her personality rather than her sex."); *Balletti v. Sun-Sentinel Co.,* 909 F.Supp. 1539, 1547 (S.D.Fla.1995) ("Where a plaintiff's action in the workplace shows that she was a willing and frequent participant in the conduct at issue, courts are less likely to find that the conduct was 'unwelcome' or 'hostile.' "). Additionally, there is no evidence that Plaintiff, at any time, let Wilson know that his sexual banter was unwelcome. *See, Balletti,* 909 F.Supp. at 1548 n. 6 ("At some point, however, a plaintiff must show that she clearly made her co-workers aware that such conduct would be considered unwelcome."). While Plaintiff alleges that she did, on some occasions, tell Wilson "no," her own evidence shows that when she did tell him "no," she also said such things as "I'm busy," or "not now," comments which tend to negate the effect of the initial "no," making her intentions less than clear. Additionally, even after telling Wilson "no," she continued to participate in the sexual banter common in the workplace.

 Assuming, arguendo, Wilson exposed himself in the van, Plaintiff has failed to provide sufficient evidence to impute liability to the corporate Defendants for Wilson's actions. Plaintiff failed to show that Wilson's actions constituted a constructive discharge. Although the sexual banter and use of inappropriate language were "pervasive," Plaintiff herself participated in and helped to create the pervasiveness. Wilson's alleged exposing himself was not "pervasive" as it occurred on a single occasion. In light of the pervasiveness of inappropriate language and actions, Wilson's alleged exposing himself does not show "a high degree of deterioration" in the workplace. *Hill v. Winn-Dixie Stores, Inc.,* 934 F.2d 1518, 1527 (11th Cir.1991). Nor can Wilson's alleged action be considered "pervasive conduct *by employers* " as CCF was completely un-

aware of Wilson's single action until a month after it happened and Plaintiff has not alleged comparable behavior by anyone else at CCF. *Id.* (emphasis added). Additionally, Plaintiff failed to give CCF "sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir. 1996), *reh'g, en banc, denied,* 105 F.3d 673 (1997). Assuming, arguendo, Plaintiff's attorney's demand letter constituted appropriate notice, CCF had no notice of Wilson's alleged actions until it received the demand letter on December 1, 1998, approximately a month after the final incident Plaintiff alleges. The letter stated that Plaintiff had "no intention of ever returning to work for you as long as this behavior is condoned by your dealership and as long as Mr. Wilson is employed by you" and gave CCF only ten days to respond. On December 3, 1998, Plaintiff's attorney was notified that an investigation would be conducted and he would be notified of the results. On December 21, 1998, a mere three weeks after initially notifying CCF of Plaintiff's allegations, Plaintiff's attorney informed CCF that "based on your total lack of response to our situation, we are going to file the EEO complaint." Plaintiff failed to provide CCF "a reasonable opportunity to remedy the problem." *Jones v. USA Petroleum Corp.,* 20 F.Supp.2d 1379, 1385 (S.D.Ga.1998). *See also, Frederick v. Sprint/United Mgr. Co.,* 246 F.3d 1305, 1314 (11th Cir.2001) ("[A]n employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint.")

By failing to show a constructive discharge, Plaintiff has failed to show that the alleged harassment "culminate[d] in a 'tangible employment action,' " *Frederick,* 246 F.3d at 1311, and CCF may raise the *Faragher/Ellerth* affirmative defense.

The evidence shows that CCF had in place a formal sexual harassment policy and that Plaintiff and other employees had not only been provided a copy of that policy but that they had been reminded of the policy in July or August 1998. Additionally, the evidence shows that on all previous instances when an employee or customer complained of sexual harassment, CCF investigated the allegations and, if they were found to be true, took immediate remedial action. Defendants have, therefore, established the first element of the *Faragher/Ellerth* defense.

The evidence also shows that Plaintiff failed to report Wilson's alleged harassment to anyone at CCF for almost a month after the final incident on November 8, 1998, and her "report" at that time was in the form of a demand letter from her attorney rather than directly from her as anticipated by CCF's sexual harassment policy. *See, Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir.1999) (An employer is "deemed to have notice of the harassment" when the employee makes "reasonably sufficient use of the channels created by [the] policy."). Plaintiff testified that she did not know any of the managers well enough to report Wilson's alleged harassment to them, she did not think anyone would believe her if she did, and she was afraid she would lose her job if she did. She has presented no evidence to support any of these reasons. Plaintiff's failure to report the alleged harassment for approximately a month was not reasonable under the circumstances. *See, Madray v. Publix Super Markets, Inc.*, 30 F.Supp.2d 1371, 1376 (S.D.Fla.1998) (a generalized fear is insufficient to justify failure to follow an employer's anti-harassment policy), *aff'd*, 208 F.3d at 1293, *cert. denied*, 531 U.S. 926, 121 S.Ct. 303, 148 L.Ed.2d 243 (2000); *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir.2001) ("Allowing subjective fears to vitiate an employee's

reporting requirement would completely undermine Title VII's basic policy 'of encouraging forethought by employers *and* saving action by objecting employees.' ").

 Plaintiff cannot succeed on her quid pro quo claims. Although Plaintiff alleged Wilson reduced the appraisal value of two vehicles after he took them on a test drive and she refused his sexual advances, she acknowledged that she had problems with Wilson's valuations on trade-in vehicles while he was assistant used car manager, prior to any alleged sexual harassment. She also acknowledged that "[w]ith [Wilson] you never knew" if he was really suggesting a sexual encounter or if he was just making a rude comment and that she did not always take his comments as serious invitations for sex. Finally, the evidence shows that trade-in vehicles had to be inspected and driven by the manager or assistant manager before a definite appraisal value could be set. Plaintiff failed to show that the vehicles at issue should have been appraised at a value higher than the value at which Wilson appraised them. Plaintiff has failed to show that she was "otherwise qualified to receive" the appraisal value set on the vehicles prior to any inspection.

## III. *State Law Claims*

### A. *Respondeat Superior*

 "The doctrine of respondeat superior is codified in O.C.G.A. § 51-2-2 which states: 'Every person shall be liable for torts committed by his wife, his child, or his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily.' " *Stephens v. Greensboro Properties, Ltd.*, 247 Ga. App. 670, 675, 544 S.E.2d 464 (2001). "The recognized legal corollary to this doctrine is that once an agent or employee departs or steps aside from his employ-

ment and undertakes an act purely personal in nature, the employer is not liable for that act." *Id.* "Thus, the test of liability is whether the tort was done within the scope of the actual transaction of the master's business for accomplishing the ends of his employment." *New Madison South, L.P. v. Gardner,* 231 Ga.App. 730, 732, 499 S.E.2d 133, *cert. denied* (1998). "The test is not strictly dependent on whether the incident occurred during the time covered by the employment or at the place of business." *Id.*

■ "[I]t is well settled under Georgia law that an employer is not responsible for the sexual misconduct of an employee." *Alpharetta First United Methodist Church v. Stewart,* 221 Ga.App. 748, 752, 472 S.E.2d 532 (1996). "The basis for these holdings is that these types of torts, being purely personal in nature, are unrelated to the employee's duties and, therefore, are outside the scope of employment because they were not in furtherance of the master's business." *Id.*

■ Plaintiff cannot succeed on her claims against the corporate defendants based on respondeat superior. Assuming, arguendo, Wilson committed any of state law torts Plaintiff alleges, he did not commit those torts "in the prosecution and within the scope of [the corporate defendants'] business" because they involved sexual misconduct. The corporate defendants cannot therefore be held liable for the torts Plaintiff alleges Wilson committed.

**B. *Assault and Battery***

■ "In the interest of one's right of inviolability of one's person, any unlawful touching is a physical injury to the person and is actionable." *Newsome v. Cooper–Wiss, Inc.,* 179 Ga.App. 670, 672, 347 S.E.2d 619, *cert. denied* (1986) (quoting *Mims v. Boland,* 110 Ga.App. 477(1), 138 S.E.2d 902(a)(4) (1964)). "Generally

speaking, an 'unlawful' touching is one which is 'offensive,' and an 'offensive' touching is one which proceeds from anger, rudeness, or lust." *Id.* "The test … 'is what would be offensive to an ordinary person not unduly sensitive as to his dignity.'" *Id.* (quoting Prosser, Law of Torts, § 9, p. 37 (4th ed.1971)).

■ Plaintiff cannot succeed on her claims for assault and battery against Wilson. The only touching to which Plaintiff objects is Wilson's hugging her and patting her bottom. As Plaintiff herself testified, however, these were not always objectionable and Wilson probably did not know when it was objectionable and when it was not. Also, Plaintiff herself participated in similar conduct not only with Wilson but with other employees.

**C. *Negligent Hiring and Retention***

■ "The appropriate standard of care in a negligent hiring/retention action is whether the employer knew or should have known the employee was not suited for the particular employment." *Kemp v. Rouse–Atlanta, Inc.,* 207 Ga.App. 876, 878, 429 S.E.2d 264, *cert. denied* (1993). "A cause of action for negligence against an employer may be stated if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment." *Harvey v. McLaughlin,* 198 Ga.App. 105, 107, 400 S.E.2d 635 (1990) (citations omitted), *cert. denied* (1991). "An employer may know, or in the exercise of due care have reason to know, of an employee's reputation for sexual harassment in the absence of complaints." *Id.* (citations omitted).

■ Plaintiff cannot succeed on her claims against the corporate defendants

for negligent hiring and retention. She has provided no evidence that Wilson had a tendency to sexually harass women, much less that he had a tendency to sexually harass women in the workplace. Thus, she cannot provided evidence that the corporate defendants knew or should have known of such tendencies.

### D. Intentional Infliction of Emotional Distress

"Georgia law recognizes the tort of intentional infliction of emotional distress." *Bridges v. Winn–Dixie Atlanta, Inc.,* 176 Ga.App. 227, 229, 335 S.E.2d 445 (1985). "The burden which the plaintiff must meet in order to prevail in this cause of action is a stringent one, however." *Id.* "Four elements must be present to support a claim of intentional infliction of emotional distress: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress must be severe." *Fisher v. Toombs County Nursing Home,* 223 Ga. App. 842, 846, 479 S.E.2d 180 (1996) (internal quotation marks omitted).

"Damages are generally not available for mental pain, suffering, or emotional distress unless ... the result of malicious, wilful, and wanton action directed at the complainant." *H.J. Russell & Co. v. Jones,* 250 Ga.App. 28, 30–31, 550 S.E.2d 450 (2001). "Wilful and wanton conduct is conduct which shows 'that entire absence of care which would raise the presumption of conscious indifference, or that with reckless indifference, the person acted with actual or imputed knowledge that the inevitable or probable consequences of his conduct would be to inflict injury.'" *Id.* at 31, 550 S.E.2d 450 (quoting *Brady v. Glosson,* 87 Ga.App. 476, 480, 74 S.E.2d 253 (1953)).

"Liability for intentional infliction of emotional distress has been found in Georgia only when a defendant's conduct is 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Turnbull v. Northside Hosp., Inc.,* 220 Ga.App. 883, 884, 470 S.E.2d 464 (quoting *Yarbrough v. SAS Systems,* 204 Ga.App. 428, 429, 419 S.E.2d 507, *cert. denied* (1992)), *cert. denied* (1996). "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." *Fisher,* 223 Ga.App. at 846–847, 479 S.E.2d 180.

"[T]he severity of the emotional distress allegedly produced by the conduct of the defendant is also a factor in determining liability for mental distress." *Moses v. Prudential Ins. Co. of Amer.,* 187 Ga.App. 222, 226, 369 S.E.2d 541 (1988). "The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Id.* "The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge." *Id.* "It is for the court to determine whether on the evidence severe emotional distress can be found." *Id.*

Plaintiff cannot succeed on her claim for intentional infliction of emotional distress. Under the totality of the circumstances in this case, the only action which is arguably extreme and outrageous enough to meet the Georgia standard is Wilson's alleged exposing himself to Plaintiff, and Plaintiff cannot show, in light of her own admitted behavior, that Wilson acted with the necessary degree of intent

or recklessness. Although Plaintiff testified that her doctors would not allow her to return to work until June 1999, she presented no evidence to support her hearsay testimony. Nor did she present any other evidence showing that her emotional distress was "severe."

### E. *Negligent Infliction of Emotional Distress*

"Negligent conduct, without more, will not support a recovery for emotional distress." *H.J. Russell & Co. v. Jones,* 250 Ga.App. 28, 30, 550 S.E.2d 450 (2001). "Damages are generally not available for mental pain, suffering, or emotional distress unless accompanied by physical or pecuniary loss or the result of malicious, wilful, and wanton action directed at the complainant." *Id.* at 30–31, 550 S.E.2d 450. "[F]or a pecuniary loss to support a claim for damages for emotional distress, the pecuniary loss must occur as a result of a tort involving an injury to the person even though this injury may not be physical. An injury to the reputation would be such an injury." *OB–GYN Associates of Albany v. Littleton,* 259 Ga. 663, 667, 386 S.E.2d 146 (1989).

Plaintiff cannot sustain her claim for negligent infliction of emotional distress. She alleged no physical injury. Although she contends her lost commissions are a pecuniary loss, she provided no evidence of "an injury to the person" required by Georgia before she may recover for a pecuniary loss.

### F. *Intentional Interference with Business Relations*

"In establishing a cause of action for malicious or tortious interference with business relations, the appellants must demonstrate that the appellee (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the appellants, and (4) for which the appellants suffered some financial injury." *Athens International, Inc. v. Venture Capital Properties, Inc.,* 230 Ga.App. 286, 288, 495 S.E.2d 900 (1998) (citation omitted). "A cause of action for tortious interference with business relations encompasses interference with a prospective business relationship as well as existing ones, and liability results not only from disruption of the relationship but also from elimination of the injured party's ability to perform." *Renden, Inc. v. Liberty Real Estate L.P.,* 213 Ga.App. 333, 334, 444 S.E.2d 814, *cert. denied* (1994). "But to establish a cause of action for interference with prospective business relations, plaintiff must demonstrate that absent the interference, those relations were reasonably likely to develop in fact." *Id.* at 334–35, 444 S.E.2d 814.

"To sustain a claim for intentional interference with business relations, the tortfeasor must be an 'intermeddler' acting improperly and without privilege." *Id.* at 336, 444 S.E.2d 814. "The tortfeasor must be a 'stranger' to the business relationship at issue; a party, under appropriate circumstances, can be a non-signer of a particular contract and yet not be a stranger to the contract itself or to the business relationship giving rise thereto and underpinning it." *Id.*

Plaintiff cannot succeed on her claim for intentional interference with business relations. As to the four customers whose vehicle deals allegedly failed due to Wilson's refusal to give an appropriate trade-in value, Wilson was not a "stranger" to the business relationship: he was Plaintiff's supervisor, responsible for determining the value of the trade-in, and responsible for approving the deal. Although Plaintiff contends the corporate defendants told her customers that she was no longer

in the automobile business, she provided no evidence to support these allegations. Nor did she provide any other evidence that either the corporate defendants or Wilson interfered with any business relation.

## IV. *Amend Pleadings*

After the time for amending as a matter of course has expired, "a party may amend the party's pleading only by leave of court; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "While the district court is accorded discretion in arriving at its decision, a justifying reason must be apparent for denial of a motion to amend." *Nolin v. Douglas County*, 903 F.2d 1546, 1550 (11th Cir. 1990). Among the factors that may be considered by the court in determining whether to grant a motion to amend is the futility of the amendment. *Id.*

Having found that Defendants are entitled to summary judgment on all of Plaintiff's claims, it would be futile to allow Plaintiff to amend the complaint.

## CONCLUSION

For the reasons stated herein, the Court GRANTS Defendants' motion for summary judgment [64–1], DENIES Plaintiff's motion for partial summary judgment [62–1], and DENIES Plaintiff's motion to amend the complaint [77–1].

**Clerk of Court** is directed to enter judgment for Defendants on all claims. This closes the case.